George W. WAYMAN, Dale Stanislaus, Jess C. Smith, Arlin "Bud" F. Roat, Brad Rhodes, Charlie Reid, John Reents, James L. McKown, Thomas McClernon, Donald B. Howell, Buddy R. Hill, Robert Henderson, Robert C. Conner, Harold Clarke, and Troy M. Botkin, Plaintiffs,

v.

AMOCO OIL COMPANY, a Maryland Corporation, Defendant.

Civil Action No. 91–1451–MLB.

United States District Court, D. Kansas.

Jan. 26, 1996.

Opinion Supplementing Decision Feb. 23, 1996.

---

Gary M. Austerman, Christopher A. McElgunn, Robert D. Wiechman, Jr., Klenda,

Mitchell, Austerman & Zuercher, Wichita, KS, for plaintiff George W. Wayman.

Gary M. Austerman, Christopher A. McElgunn, Robert D. Wiechman, Jr., Klenda, Mitchell, Austerman & Zuercher, Wichita, KS, for plaintiffs Dan Stanislaus, Jess C. Smith, Arlin Roat, Brad Rhodes, John Reents, James L. McKown, Thomas F. McClernon, Donald B. Howell, Buddy R. Hill, Harold Clarke, Troy M. Botkin.

Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, Richard C. Godfrey, David J. Zott, Frank Cicero, Jr., Kirkland & Ellis, Chicago, IL, William J. Noble, Chicago, IL, Mark S. Lillie, Kirkland & Ellis, Denver, CO, for defendant Amoco Oil Co.

John J. Kisner, Jr., Office of the District Attorney, Wichita, KS for intervenor State of Kansas.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court on defendant Amoco Oil Company's Motion for Summary Judgment. (Doc. 126.)

Plaintiffs are current or former Wichita area Amoco service station dealers. They have filed this action against Amoco alleging seven state law causes of action, including two counts of breach of contract, two counts of misrepresentation, breach of lease, breach of fiduciary duties, and violation of the Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50–623, *et seq.* (Doc. 75, Counts I–VII.) Plaintiffs' claims are similar to those made by other Amoco dealers in various other parts of the United States. Amoco seeks summary judgment on all seven of plaintiffs' claims.

### Table of Contents

Summary Judgment Standards ......................................... ——
Background
 The Nature of the Parties' Relationship ....................................... ——
 The Dealer Supply Agreement (DSA) ..................................... ——
 The Lease Agreement ..................................... ——
 The Meter Marketing Plan, Dealer Buying Price and Pricing Strategies ........... ——
 The Discount for Cash Program (DFC) ..................................... ——
 The Investment Value Rent Program ..................................... ——
Discussion
 Count I—Breach of Contract—DFC ..................................... ——
 Plaintiffs' admissions in deposition ..................................... ——
 The U.C.C. parol evidence rule, K.S.A. 84–2–202 and DSA's terms ............ ——
 Admissibility of the alleged DFC/DBP offset and the DSA ................... ——
 Admissibility of the alleged DFC/DBP offset and the credit card contract.. ——
 Admissibility of the alleged DFC/DBP offset as "course of dealing" ........... ——
 Admissibility of the alleged DFC/DBP offset as a subsequent agreement ...... ——
 Enforceability of integration clauses ..................................... ——
 Equitable estoppel ..................................... ——
 Count II—Misrepresentation—DFC ..................................... ——
 Count III—Breach of Contract—U.C.C. § 2–305(2) ..................................... ——
 Count IV—Breach of Lease—IVR Program ..................................... ——
 Count V—Misrepresentation—IVR Program ..................................... ——
 Count VI—Breach of Duty of Good Faith ..................................... ——
 Count VII—Violations of Kansas Consumer Protection Act ..................................... ——
 Plaintiffs as "individuals" under K.S.A. § 50–624(b) ..................................... ——
 "Business purposes" as contemplated by K.S.A. § 50–624(b) ................. ——
 Deceptive and unconscionable practices ..................................... ——
Orders ..................................... ——

*SUMMARY JUDGMENT STANDARDS*

▮ Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judg-

ment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The burden of proof at the summary judgment stage is similar to that at trial. "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"[1] *Aldrich Enters., Inc. v. United States*, 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993). This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. (Emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir.1993). The court reviews the evidence in a light most favorable to the nonmoving party, *e.g., Thrasher v. B & B Chemi-*

cal Co., Inc., 2 F.3d 995, 996 (10th Cir.1993), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

### BACKGROUND [2]

#### I. The Nature of the Parties' Commercial Relationship

Amoco is in the business of selling gasoline and other petroleum products through a network of service station dealers and independent "jobbers" around the United States. Plaintiffs are service station dealers who sell Amoco-branded products in Kansas.[3] Plaintiffs are independent businessmen; they set their own retail prices and make their own purchasing, advertising, and marketing decisions. Plaintiffs have had to invest money in their service stations and, in some cases, they have incurred long-term financial obligations.

Plaintiffs' relationship with Amoco is two-tiered. First, plaintiffs are *franchisees* of Amoco, marketing and selling Amoco-branded gasoline and automotive products. Second, plaintiffs are *lessees* of Amoco, leasing Amoco-owned service station facilities.

Amoco requires plaintiffs and most (if not all) of its other dealers to sign certain pre-printed, standardized form contracts which govern their franchisor-franchisee and lessor-lessee relationships. Most significant among these are the "Dealer Supply Agreement" or DSA, concerning the parties' franchise relationship, and the "Lease Agreement," concerning the parties' lessor-lessee relationship. Over the years, plaintiffs have entered into a series of Dealer Supply Agreements and Lease Agreements with Amoco, signing new contracts as previous ones terminated. The agreements usually ran for three years. In addition, plaintiffs contend that Amoco has implemented various pro-

---

**1.** There are discovery disputes pending in this case, but both parties concede that those disputes do not affect this particular motion and that ample time for discovery has already been provided.

**2.** Because of the volume of materials submitted by the parties in support of their motions, and the court's concern that it understand the facts and the parties' claims, the court submitted this section to counsel for their review and comment.

The changes and additions suggested by counsel, with the exception of a couple of argumentative submissions, have been incorporated either verbatim or in substance. (Docs. 211 and 212.)

**3.** Some of the plaintiffs are no longer Amoco dealers. The court refers to each as a dealer in the present tense for the sake of simplicity in setting forth the facts of the case.

grams and policies which bear significantly upon the relationship between Amoco and the dealers under the written contracts and agreements.

The DSAs, Lease Agreements, and other standardized contracts were presented to plaintiffs by an Amoco territory manager who was familiar with all phases of dealer operations. Pete Christy was the territory manager for Wichita from 1967 to 1991. Christy "deliver[ed] various written contracts such as the [DSA] and Lease Agreement in a package of documents to the dealers at the time they became a dealer and thereafter on their renewal dates." (Doc. 181, Christy Affidavit, ¶ 5.) Christy "would answer questions about the contracts, if the dealer had any, but [he] did not routinely go over the contract paragraph by paragraph. [He] was not familiar with all the fine print of the contracts." *Id.* at ¶ 6.

## II. *The Dealer Supply Agreement*

Under the DSA, Amoco agrees to "sell and deliver" gasoline and other products to the plaintiffs, and plaintiffs agree to "purchase and receive" the gasoline and other products from Amoco "in such reasonable quantities as [plaintiffs] may order." (Doc. 128, Ex. 1A, ¶ 1.)[4] The DSA provides that the price for gasoline purchased by plaintiffs shall be "Amoco's dealer buying price" or DBP:

> Prices. The price for motor fuels purchased by Dealer from Amoco hereunder, shall be Amoco's *dealer buying price* for each respective grade of said products in effect in Amoco's pricing area in which the above-identified motor fuel sales facility is located at the time when title to said products passes from Amoco to Dealer . . . . .

*Id.* at ¶ 4 (underline added). The DSA requires plaintiffs to "offer for sale from the Premises 'representative amounts' of Amoco's trademarked motor fuels" or "Amoco [has] the right to terminate [the DSA] and any franchise relationship between Amoco and Dealer." *Id.* at ¶ 19. The DSA does

not, however, require that plaintiffs buy these "representative amounts" of Amoco's trademarked fuels directly from Amoco, as opposed to an Amoco-branded jobber. (*See, e.g.,* Doc. 179, Wayman Depo., p. 10–11; Doc. 174, Howell Depo., p. 27.) Nor does the DSA "preclude [plaintiffs] from selling competitive-brand products" at their service stations. (Doc. 128, Ex. 1A, ¶ 15.)

All of the DSAs between Amoco and plaintiffs contain "merger" or "integration"-type clauses. There are some variations depending upon the date of the agreement. The 1989 and 1991 versions of the DSA state:

> **Entire Agreement.** This Dealer Supply Agreement cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this Agreement. No obligations, agreements or understandings shall be implied from any of the terms and provisions of this Agreement, all obligations, agreements and understandings with respect to the subject matter hereof being expressly set forth herein. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Agreement. No modification or waiver of, addition to, or deletion from the terms of the Agreement shall be effective unless reduced to writing and signed by Dealer and a representative of Amoco authorized to execute this Agreement.

(Doc. 128, Ex. 1A, ¶ 23; Doc. 164, Ex. 5, 1989 and 1991 Dealer Supply Agreement, ¶ 23.)

The 1981, 1983, and 1986 versions are slightly different:

> **Sole Agreement.** This Dealer Supply Agreement cancels and supersedes all prior agreements and understandings between the parties hereto pertaining to the matters covered herein, and there are no other agreements, written or oral, between the parties pertaining to the subject mat-

---

**4.** The court will refer to the DSAs and Lease Agreements in singular form for purposes of simplicity. All references are to the DSA and Lease Agreement of lead plaintiff Wayman, entered into April 27, 1988, attached as exhibits to Amoco's motion. Plaintiffs have submitted numerous Dealer Supply and Lease Agreements to the court, (Doc. 164, Exs. 1, 2, & 5), and the court has reviewed each one. The provisions in each of the agreements, although ordered somewhat differently, are similar to those in plaintiff Wayman's.

ter hereof. This agreement does not cancel or supersede any written lease of Premises, written agreement for the loan of equipment, written agreement relating to the honoring of credit cards, trademark agreement, or other written agreement between the parties not directly incompatible herewith or directly covering the same subjects hereof.

(Doc. 164, Ex. 5, 1981, 1983, and 1986 Dealer Supply Agreements, ¶ 21.)

### III. *The Lease Agreement*

Under the parties' Lease Agreements, Amoco agrees to "demise and lease" certain service station facilities to plaintiffs, and plaintiffs agree to pay Amoco a stated sum per month during the first year of the lease. (Doc. 128, Ex. 1B, ¶¶ 1–4.) If the lease is for a term of more than one year (most of the leases are for a three year term), Amoco "reserves the right to modify the monthly rental ... to conform with [Amoco's] established policy rental in effect" for the particular type of facility being leased. *Id.* at ¶ 5. Like the DSA, the Lease Agreement gives Amoco the right to terminate the parties' commercial relationship if the dealer discontinues the sale of representative amounts of Amoco products. *Id.* at ¶ 25.

Like the DSA, the Lease Agreement contains a merger or integration-type clause. The 1989 and 1991 Lease Agreements provide:

> **Entire Agreement.** This Lease cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this Lease. No obligations, agreements or understandings shall be implied from any of the terms and provisions of this Lease, all obligations, agreements and understandings with respect to the subject matter hereof being expressly set forth herein. No representations or statements, other than those expressly set forth herein, were relied upon by the parties in entering into this Lease. No modification or waiver of, addition to, or deletion from the terms of this Lease shall be effective unless reduced to writing and signed by

Lessee and a representative of Lessor authorized to execute this Lease.

(Doc. 128, Ex. 1B, ¶ 30; Doc. 164, Ex. 5, 1989 and 1991 Lease Agreements, ¶ 30.)

The 1980, 1983, and 1986 Lease Agreements simply state:

> This lease shall not be modified or amended except in writing. No obligation, agreement or understanding shall be implied from any of the terms and provisions of this lease, all obligations, agreements and understandings with respect to the leased premises being expressly set forth herein.

(Doc. 164, Ex. 5, 1980, 1983, and 1986 Lease Agreements, ¶ 28.)

### IV. *The Meter Marketing Plan, Dealer Buying Price, and Pricing Strategies*

Pursuant to the DSA, Amoco delivers fuel to plaintiffs in accordance with the provisions of a "Meter Marketing Plan Agreement," another of the standardized written contracts entered into by the parties:

> **Delivery—Motor Fuels.**
>
> (a) **Amoco** shall, during the term hereof, deliver the above-identified motor fuels to **Dealer** at the above-identified motor fuel sales facility in accordance with the applicable Dealer Delivery Plan Agreement or Meter Marketing Plan Agreement in effect at the time of delivery. **Dealer** shall abide by the terms of the applicable Agreement in effect at the time....

(Doc. 128, Ex. 1A, ¶ 5.) Under the Meter Marketing Plan, Amoco delivers gasoline to plaintiffs' service station's underground storage tanks on a bailment basis. (Doc. 163, p. 38; Doc. 164, Ex. 3.) Plaintiffs are required to provide Amoco "24 hour-per-day access to [their] motor fuel storage for purposes of delivery." (Doc. 128, Ex. 1A, ¶ 5(e).) Amoco retains title to the gasoline in plaintiffs' storage tanks until it is actually pumped from the tank through the dealers' metered gas pumps, at which time the title passes to the dealer. The "dealer buying price" or DBP (which is not actually mentioned in the Meter Marketing Plan) is thus established at the time the gasoline is purchased by a customer, not when Amoco delivers the fuel to the

respective service stations.[5] Plaintiffs periodically record the volume of fuel dispensed through their stations' pumps and report those amounts to Amoco. Amoco charges plaintiffs' accounts in accordance with the amounts reported and the applicable DBP.

Plaintiffs have substantial complaints about the manner in which Amoco sets its DBP. Plaintiffs claim that, contrary to Amoco's representations, Amoco's pricing strategies have been designed to yield one-sided benefits to Amoco at plaintiffs' expense. According to plaintiffs, the Wichita gasoline market is extremely competitive and driven by independent sellers and jobbers, intermediate distributors who sell gasoline to other dealers rather than directly to consumers. Plaintiffs allege that Amoco's DBP is higher than the price at which independent marketers buy their fuel, meaning plaintiffs make less margin per gallon. Plaintiffs complain that it is difficult for them, encumbered by the Meter Marketing Plan and forced to pay the DBP established by Amoco, to maintain competitive retail gasoline prices that attract customers and still make a satisfactory profit on gasoline sales.

5. In their brief, plaintiffs express considerable dissatisfaction with this arrangement:
 The dealer buying price can change several times a week. Since a dealer cannot fix a dealer buying price when the gasoline is placed in the tank and prices are down the dealer cannot take advantage of favorable price situations. Amoco, on the other hand, determines the dealer buying price with the benefit of evaluating market conditions and its costs. It can determine exactly the amount of margin it wants to make between the dealer buying price and its cost and the dealer buying price and the competitive wholesale prices in the area.
 (Doc. 163, p. 39.)

6. Since the filing of the lawsuit and the briefing of the pending motion, this program appears to have been discontinued, in whole or in part. Some (perhaps all) of plaintiffs' stations advertise that gasoline prices are the same for cash or credit card transactions. Counsel have not informed the court that this change alters the issues and the court will proceed as though no alteration has occurred.

7. The credit card transaction fee is provided for in the aforementioned Dealer/Jobber Credit Card Contracts. (Doc. 164, Ex. 4.) Pursuant thereto, plaintiffs submit signed credit card sales slips to Amoco, and Amoco purchases the sales slips for

## V. The Discount for Cash Program [6]

Amoco offers its customers credit cards which enable them to purchase fuel and other items and services on credit at Amoco stations. Plaintiffs accept Amoco credit cards at their stations. A "Dealer/Jobber Credit Card Contract," yet another of the standardized contracts between the parties, currently governs the credit card sales transactions between plaintiffs and Amoco. (Doc. 164, Ex. 4, ¶ III(B).)

Prior to 1982, Amoco never charged its dealers a fee for the costs of its credit card system. Instead, those costs were built into the cost of gasoline or, in other words, were simply part of the DBP. In 1982, Amoco adopted a "Discount for Cash" (DFC) program purportedly designed to remove the cost of the credit card system from the cost of the gasoline and ensure that only credit card customers, not cash customers, paid for the credit card system. Under the DFC program, Amoco charged plaintiffs a credit card transaction fee of 4% and, according to plaintiffs, promised to reduce the DBP by 2.8¢.[7] Later, when the credit card transac-

their total face value minus a "discount" or credit card transaction fee reflected as a percentage of the total value of the sales slip. *Id.* at ¶ VI(B). That percentage is established by Amoco at the time the sales slips are delivered by plaintiffs to Amoco. *Id.*

Plaintiffs admit that the credit card contracts mention a "discount for cash" but assert that the contracts do not explain what is entailed in such a "discount." Plaintiffs point to the following paragraphs of the contract and contend that paragraph V.L. provides that a dealer "shall not impose a surcharge with any credit card transaction." However, paragraph II.C of the credit card contract defines a "surcharge" as "any charge imposed on a credit card buyer which is not imposed on buyers who pay cash, but shall not include a discount for cash." (Doc. 164, Ex. 4.)

The credit card contracts contain the following merger or integration clause:
 This Agreement cancels and supersedes all prior agreements and understandings between the parties hereto pertaining to the subject matters hereof, and there are no other agreements, written or oral, between the parties pertaining to the subject matter hereof. . . .
 This Agreement shall not be modified except in writing, executed by both parties.
*Id.* at ¶¶ XII & XIII.

tion fee was lowered to 3%, the alleged promised offset in the DBP was to be correspondingly decreased to 2.1¢. Plaintiffs and other Amoco dealers were to pass on the savings in the DBP to their cash-paying customers by charging them 4¢ less per gallon than credit card purchasers. Amoco hoped that this "Discount for Cash" would attract more cash customers to Amoco stations resulting in increased sales.[8]

Plaintiffs implemented the DFC program at their service stations and began paying Amoco the required credit card transaction fee. However, according to plaintiffs, Amoco never gave plaintiffs the DBP offset it had allegedly promised. Plaintiffs contend that although Amoco claimed to be reducing the DBP, Amoco was actually adding an amount equivalent to the promised offset *before* subtracting the same amount and arriving at its final or net DBP. That is, according to plaintiffs, Amoco would add 2.1¢ to its DBP and then subtract 2.1¢ from that amount to make it look as if plaintiffs were getting an offset in the DBP when they actually were not. (Doc. 163, p. 52.) Plaintiffs claim that Amoco continued to represent to them that they were receiving a bona fide 2.1¢ DBP offset.

### VI. *The Investment Value Rent Program*

Amoco internally calculates its rental profit goals before determining what rent to charge its tenant dealers. In 1985, Amoco began basing such internal calculations on what it calls "Investment Value Rent" or IVR. Using this system, Amoco computes a "Base IVR Rent" for each service station and utilizes this figure in determining the contract rent or modifications to the contract rent for each dealer.[9] The "Base IVR Rent" consists of several components, including an investment base component, a service bay component, a maintenance component, and a tax component. An internal accounting document known as a "Capital Asset Ledger," which purportedly lists all Amoco-owned assets at each station, is used in calculating each dealer's "Base IVR Rent." The IVR program was purportedly designed to provide some year-to-year certainty and stabilize rents "so that dealers can plan and budget without having to wonder what's going to happen to their rent bills each year." (Doc. 165, Christy Depo., Ex. 1.)

According to plaintiffs, Amoco represented to them that rents would be based on the IVR calculations and capital asset ledgers, and promised that it would not increase rents absent changes in taxes or capital improvements. Plaintiffs allege that Amoco further represented that IVR was designed to accomplish the following: (1) remove fixed costs from the cost of gasoline; (2) achieve rental equity, stability, and predictability; and (3) recover Amoco's costs while providing a modest return on the capital investment base of the service stations. Plaintiffs contend that Amoco failed to honor these representations about the program's objectives and the method of calculation of rent. According to plaintiffs, Amoco breached its own representations by: (1) increasing rentals for reasons other than changes in taxes or capital improvements; (2) including items in the capital assets ledgers that were duplicitous or had been removed from the leased premises; (3) assessing additional rental charges for the use of service bays even though a service bay component had already been included in the Base IVR Rent calculations; and (4) including a tax component as part of the base IVR Rent calculation even though Amoco did not pay taxes on certain property it leased from other landlords and subleased to dealers. Plaintiffs further claim that the IVR program as implemented by Amoco did not achieve its goals of stabilizing rent and providing a basis for a dealer to predict his rent over the term of his Lease Agreement.

Plaintiffs generally assert that since 1982 and 1985, with the implementation of DFC

---

8. For a more thorough analysis of the reasoning behind the discount for cash program, see *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1238–39 (7th Cir.1986).

9. As seen *supra*, the parties' Lease Agreements provide for modification of monthly rental rates "[i]n the event that the original term of th[e] Lease is for more than one year." (Doc. 128, Ex. 1B, ¶ 5.) Hence, the contract rent can vary after the first year.

and IVR, Amoco affirmatively misrepresented that its pricing strategies would incorporate these two programs and, by removing the cost of the credit card program and unbundling lease costs from the DBP, make Amoco's DBP more competitive. (Doc. 163, ¶¶ 20, 64, 72.)

## DISCUSSION

### I. COUNT I: Breach of Contract—Discount for Cash Program

Count I of plaintiffs' Amended Complaint revolves around the alleged unwritten Discount for Cash/Dealer Buying Price offset arrangement (hereinafter referred to as the "alleged DFC/DBP offset agreement"). Plaintiffs allege that

> Amoco has breached its agreements[,] both written and oral, by failing to reduce or discount its price of motor fuel to plaintiffs by 2.8¢ per gallon, later changed to 2.1¢ per gallon when the credit card fee was reduced from 4% to 3%, or by manipulating or setting the DBP in such a fashion as to make the promised discount illusory.

(Doc. 75, ¶ 36.)

Amoco contends that it is entitled to summary judgment on Count I for essentially two reasons: (1) plaintiffs have admitted in sworn depositions that Amoco did not breach its contract with them; and (2) the parol evidence rule and the terms of the parties' Dealer Supply Agreements, including the integration clauses, preclude plaintiffs from presenting any evidence of the alleged DFC/DBP offset agreement.

### A. Plaintiffs' admissions in their depositions

██ According to Amoco, plaintiffs admitted during their depositions that Amoco has not breached its agreements with them. The court has reviewed plaintiffs' deposition testimony and finds Amoco's position to be unfounded. Plaintiffs have admitted that Amoco has a considerable amount of discretion in gas pricing and other matters and that, in a number of aspects of their commercial relationship, Amoco has held up its end of the bargain. But plaintiffs have not admitted that there was no alleged DFC/DBP offset agreement—which is what they are claiming in Count I—nor have they admitted that Amoco did not breach such an agreement. Moreover, plaintiffs are not lawyers or otherwise educated in the labyrinthine rules of contract interpretation.

In sum, Amoco wants this court to read something into plaintiffs' deposition testimony that simply is not there. The court will not do so.

### B. The parol evidence rule and the DSA's terms

Amoco contends that the parol evidence rule and the very terms of the DSAs themselves preclude plaintiffs' evidence of the alleged DFC/DBP offset agreement. It is undisputed that the UCC's version of the parol evidence rule, UCC § 2–202, applies to this case. UCC § 2–202 addresses the admissibility of evidence that purportedly establishes a term that does not appear in the written contract.

**Final written expression; Parol or extrinsic evidence.** Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) by course of dealing or usage of trade (section 84–1–205) or by course of performance (section 84–2–208); and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

K.S.A. § 84–2–202.

Looking to UCC § 2–202, Amoco contends that the DSAs are the parties' "final expressions" of their agreements with respect to gasoline pricing, that plaintiffs' evidence of the alleged DFC/DBP offset agreement flatly contradicts the DSA's gasoline pricing provisions, and that such evidence is therefore inadmissible. Amoco points to the language

in the DSA's integration clauses (quoted *supra*) as evidence that the DSAs were intended to be "final expressions" of the parties' agreements within the meaning of UCC § 2–202:

> This Dealer Supply Agreement cancels and supersedes all prior written and unwritten agreements and understandings between the parties pertaining to the matters covered in this Agreement. No obligations, agreements or understandings shall be implied from any of the terms and provisions of this Agreement, all obligations, agreements and understandings with respect to the subject matter hereof being expressly set forth herein.

(1989 & 1991 version).

> This Dealer Supply Agreement cancels and supersedes all prior agreements and understandings between the parties hereto pertaining to the matters covered herein, and there are no other agreements, written or oral, between the parties pertaining to the subject matter hereof.

(1981, 1983, & 1986 versions).

Plaintiffs counter Amoco's UCC § 2–202 argument from a number of different angles, many of which are rather obscure and difficult to specifically identify. The court has done its best to decipher plaintiffs' response and perceives five principal contentions:

1. *Is evidence of the alleged DFC/DBP offset agreement admissible under § 2–202(b) as evidence of a "consistent additional term" to the DSAs?*

■ First, plaintiffs contend that their evidence of the alleged DFC/DBP offset agreement is admissible under UCC § 2–202(b) as evidence of a "consistent additional term." Plaintiffs point to Official UCC Comment 3 to § 2–202, which states:

> Under paragraph (b) consistent additional terms, not reduced to writing, may be proved unless the court finds that the writing was intended by both parties as a complete and exclusive statement of all the terms. If the additional terms are such

that, if agreed upon, they would *certainly have been included* in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact.

K.S.A. § 84–2–202, Official UCC Comment 3 (emphasis added). Plaintiffs contend that the alleged DFC/DBP offset agreement would not "certainly have been included" in the DSAs, because the DSAs themselves contemplate the existence of a number of other agreements between the parties, and the DSAs are therefore not "complete and exclusive statements" of the parties' terms. (Doc. 163, p. 80.)

The court rejects plaintiffs' UCC § 2–202(b) "consistent additional term" argument. Even construing the DSA strictly against Amoco, plaintiffs' evidence of the alleged DFC/DBP offset agreement is not *"consistent"* with the DSA's express terms. First, the integration clauses clearly state that the DSAs contain all of the parties' agreements and cancel and supersede any prior written or unwritten agreements between the parties with respect to the matters covered therein, including the matter of gasoline pricing. Plaintiffs proffer the alleged DFC/DBP offset agreement in *contradiction* of the DSA's terms by suggesting that additional agreements governing gasoline pricing exist. Second, the DSAs clearly give Amoco considerable discretion in gasoline pricing.[10] The pricing provisions identify the purchase price as "Amoco's DBP in effect" and do not suggest that Amoco is bound by any objective criteria or otherwise restricted in determining the DBP. Plaintiffs' allegation that, under the alleged DFC/DBP offset agreement, Amoco is obligated to price its gasoline at 2.1¢ below the DBP is inconsistent with this discretion.

The court's findings are supported by a recent decision of an Illinois appellate court. In *Abbott v. Amoco Oil Co.*, 249 Ill.App.3d 774, 189 Ill.Dec. 88, 619 N.E.2d 789, *appeal denied*, 153 Ill.2d 557, 191 Ill.Dec. 616, 624 N.E.2d 804 (1993), a large group of Chicago

---

**10.** As a practical matter, of course, Amoco's power to set gasoline prices is somewhat limited. Because the dealers are the ones who ultimately set the retail price for gasoline, Amoco must charge the dealers a price which enables them to sell gasoline at a fairly competitive price or Amoco cannot expect to realize much financial gain from the dealers' gasoline sales.

area Amoco dealers sued Amoco and alleged causes of action very similar to those in the present case, including a claim that Amoco had breached its contract with respect to an alleged DFC/DBP offset agreement. *Id.,* 249 Ill.App.3d at 776–77, 189 Ill.Dec. at 91, 619 N.E.2d at 792. The trial court dismissed the dealers' complaint, and the appellate court affirmed. In evaluating the dealers' allegations with respect to an alleged DFC/DBP offset agreement, the appellate court focused on the provisions in the DSAs concerning prices and integration and found that the dealers' allegations contradicted these provisions:

> The dealers' claim here is that Amoco promised them a discount in the price of gas to offset credit fees Amoco began to charge on credit card transactions and that Amoco then failed to provide the discounts in a "realistic" and "meaningful" manner, meaning that the dealers thought that Amoco's gas was still priced too high, even after the application of the discount. Thus, the dealers argue, essentially, that Amoco charged them too much for its gasoline. This claim is directly contrary to both the integration clause and the provisions of the DSA's allowing Amoco to charge the dealers the price for gasoline in effect in the dealers' geographic area at the time the dealers take title to the gas.

*Id.,* 249 Ill.App.3d at 780, 189 Ill.Dec. at 93, 619 N.E.2d at 794.

The Chicago area dealers' claim in *Abbott* and the Wichita area dealers' claim in the present case boil down to the same thing: "Amoco charged too much for its gasoline." *Id.* Like the dealers in *Abbott,* plaintiffs granted Amoco considerable discretion in setting gasoline prices when they entered into their DSAs, and they cannot now, having found that they do not like Amoco's exercise of that discretion, seek to have the DSAs rewritten. *See Catholic Diocese of Dodge City v. Raymer,* 251 Kan. 689, 693, 840 P.2d 456 (1992) ("[T]he court may not make another contract for the parties. Its function is to enforce the contract as made.").

The court accordingly finds, under UCC § 2–202, that the DSAs were intended to be a "final expression" of the parties' agreement with respect to gasoline pricing and that the DSAs cannot, therefore, be contradicted by evidence of the alleged DFC/DBP offset agreement.

2. *Is evidence of the alleged DFC/DBP offset agreement admissible under § 2–202(b) as evidence of a "consistent additional term" to the parties' credit card contract?*

 Plaintiffs also contend that their evidence of the alleged DFC/DBP offset is admissible as evidence of a consistent additional term to the parties' Dealer/Jobber Credit Card Contracts. (Doc. 163, p. 82.) As discussed *supra,* under the credit card contracts, Amoco is authorized to charge plaintiffs a credit card transaction fee of an unspecified amount when it purchases plaintiffs' credit card sales slips. Plaintiffs contend that, because the credit card contracts do not identify the amount of the credit card transaction fee, the contract is open to evidence of additional relevant terms and agreements, specifically, the alleged DFC/DBP offset agreement. The court finds two flaws in this argument.

First, whatever connection the alleged DFC/DBP offset agreement may have with the credit card contract, evidence of such an agreement still contradicts the DSAs, the "final expression" of the gasoline pricing terms, and is therefore inadmissible.

Second, the credit card contracts, like the DSAs, have an integration clause. It provides that all prior agreements and understandings pertaining to the subject matters covered in the credit card contracts are cancelled and superseded and that there are no other agreements, written or oral, between the parties pertaining to those matters. (Doc. 164, Ex. 4, ¶XII.) Hence, the credit card contracts, like the DSAs, are "final expressions" and cannot be contradicted by evidence of any prior agreement. Evidence of the alleged DFC/DBP offset agreement is contradictory because it suggests that Amoco gave consideration in the form of a DBP offset in exchange for plaintiffs' paying credit card transaction fees. The credit card contracts mention no such consideration. If such consideration was promised, it "certainly would have been included" in the credit

card contracts, meaning the contracts are also "complete and exclusive statements" of the parties' agreements and that even evidence of *consistent* additional terms would be inadmissible. *See* K.S.A. § 84–2–202(b) & Official UCC Comment 3.

3. *Is evidence of the alleged DFC/DBP offset agreement admissible under § 2–202(a) as evidence of the parties' "course of dealing"?*

 Plaintiffs contend that even if evidence of the alleged DFC/DBP offset agreement is not admissible as evidence of a consistent additional term, it is still admissible under § 2–202(a) as evidence of the parties' "course of dealing." (Doc. 163, p. 87.) As support for this contention, plaintiffs rely on an oft-cited Ninth Circuit case, *Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772 (9th Cir.1981). In that case, Nanakuli entered into a contract to purchase asphalt from Shell at Shell's "Posted Price." Nanakuli then contracted with a number of third parties to supply them with asphalt at a specified price based on Shell's then-existing "Posted Price." Subsequently, Shell raised its "Posted Price" by a substantial amount, impairing Nanakuli's contracts with the third parties. Nanakuli sued Shell for breach of contract, arguing that Shell had a duty to protect Nanakuli from inordinate increases in the "Posted Price." Nanakuli relied primarily on "usage of trade" evidence that, in the asphalt industry, it was a prevailing practice for suppliers to provide price protection for their buyers. A jury verdict was returned in Nanakuli's favor, but the trial court granted j.n.o.v. based on Shell's argument that Nanakuli's evidence of trade usage contradicted the express terms of the parties' contract. The Ninth Circuit reversed, holding as follows:

> [A]lthough the express price terms of Shell's posted price of delivery may seem, at first glance, inconsistent with a trade usage of price protection at time of increases in price, a closer reading shows that the jury could have reasonably construed price protection as consistent with the express term. We reach this holding for several reasons. First, we are persuaded by a careful reading of the U.C.C.,

one of whose underlying purposes is to promote flexibility in the expansion of commercial practices and which rather drastically overhauls this particular area of the law. The Code would have us look beyond the printed pages of the contract to usages and the entire commercial context of the agreement in order to reach the "true understanding" of the parties. Second, decisions of other courts in similar situations have managed to reconcile such trade usages with seemingly contradictory express terms where the prior course of dealings between the parties, trade usages, and the actual performance of the contract by the parties showed a clear intent by the parties to incorporate those usages into the agreement or to give to the express term the particular meaning provided by those usages, even at times varying the apparent meaning of the express terms. Third, the delineation by thoughtful commentators of the degree of consistency demanded between express terms and usage is that a usage should be allowed to modify the apparent agreement, as seen in the written terms, as long as it does not totally negate it. We believe the usage here falls within the limits set forth by commentators and generally followed in the better reasoned decisions.

*Id.* at 780. The Ninth Circuit also reversed the trial court's exclusion of certain "course of dealing" evidence showing that Shell had engaged in price protection in the past, even though an integration clause in the parties' agreement expressly stated that evidence of "dealings" was not to be allowed. *Id.* at 782 n. 14.

 Based on *Nanakuli* and the UCC, it is positively clear that bona fide course of dealing evidence is admissible to "explain and supplement" the DSAs and other contracts at issue in the present case. K.S.A. § 84–2–202(a). The integration clauses in the DSAs do not purport to exclude the parties' prior dealings from evidence, and UCC § 2–202 plainly indicates that the terms of a written contract, even though intended to be a "final expression" and "complete and exclusive statement" with respect to the matters addressed therein, "may be explained or

supplemented by course of dealing or usage of trade or by course of performance." K.S.A. § 84–2–202; *see also* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 2–10, at 118 (3d ed. 1988) [hereinafter "White & Summers"] ("[C]ourts will likely permit parties to use course of dealing, usage of trade, or course of performance to establish *additional* terms.") (emphasis added). Moreover, *Nanakuli* establishes that course of dealing evidence (as well as other types of UCC § 2–202(a) evidence— usage of trade and course of performance) need not be entirely consistent with the DSA's express terms in order to be admissible. So long as course of dealing evidence can be *"reasonably construed* ... as consistent with the express term," it can still be used to explain and supplement the parties' agreement. 664 F.2d at 780. There are, nevertheless, problems with plaintiffs' "course of dealing" argument.

First, plaintiffs have alleged no course of dealing evidence to suggest the existence of the alleged DFC/DBP offset agreement. "Course of dealing" involves "the sequence of conduct between the parties previous to the agreement." K.S.A. § 84–1–205, Official UCC Comment 2. Plaintiff's allegations are that the "sequence of conduct" between plaintiffs and Amoco was such that Amoco never actually provided a DBP offset. In *Nanakuli,* by contrast, there was substantial evidence that Shell had provided price protection in the past. 664 F.2d at 778, 782 n. 14.

Second, as discussed *supra,* the court does not believe that a jury could "reasonably construe" the alleged DFC/DBP offset agreement as "consistent" with the parties' DSAs and credit card contracts. *Id.* at 780. Under UCC § 2–208(2), "[t]he express terms of the agreement and any ... course of dealing ... shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control ... course of dealing." K.S.A. § 84–2–208(2). Once again, this clearly distinguishes plaintiffs' evidence in the present case from the evidence of price protection in *Nanakuli.*

In the final analysis, the court finds that plaintiffs' evidence of the alleged DFC/DBP offset agreement is not evidence of a "usage of trade" in the gasoline industry or a "course of dealing" between the parties. Rather, it is evidence of an inconsistent and contradictory additional term and/or another agreement altogether. Plaintiffs cannot elude the parol evidence rule by cloaking evidence of an inconsistent term or agreement in the clothes of "course of dealing."

4. *Is evidence of the alleged DFC/DBP offset agreement admissible as evidence of a subsequent agreement or modification?*

The parol evidence rule (UCC § 2–202) does not apply to evidence of subsequent agreements or modifications of a contract. White & Summers, § 2–10, at 106. In a further effort to avoid the parol evidence rule, plaintiffs contend that the alleged DFC/DBP offset agreement can be characterized as either a "subsequent agreement" or a "modification" of the parties' other agreements. (Doc. 163, p. 90.) Both of these potential characterizations, however, have an obvious shortcoming: Any subsequent agreement or modification must be manifested by a writing signed by the parties.

Subsequent agreements must comply with the statute of frauds: "[A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." K.S.A. § 84–2–201(1).

Modifications must comply with the modification terms set forth in the contracts they purport to modify. Under UCC § 2–209(2), "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded." K.S.A. § 84–2–209(2). The DSAs state that "[n]o modification ... of the Agreement shall be effective unless reduced to writing and signed by Dealer and a representative of Amoco authorized to execute this Agreement." (Doc. 164, Ex. 5, 1989 and 1991 DSAs, ¶ 23.) Similarly, the credit card contracts provide that they "shall not be modified except in writing, executed by both

parties." (Doc. 164, Ex. 4, Credit Card Contract, ¶ XIII.)

Plaintiffs have presented no writing manifesting the alleged DFC/DBP offset agreement to support either their "subsequent agreement" or "modification" arguments.

### 5. *Are the integration clauses and the contracts enforceable?*

■ Amoco has relied heavily on the integration clauses and parol evidence rule to establish the grounds for summary judgment on Count I. Integration clauses are generally held to be valid and effective, White & Summers, § 2–12, at 122, especially when two commercial parties are involved, *Ray Martin Painting, Inc. v. Ameron, Inc.*, 638 F.Supp. 768, 774 (D.Kan.1986). Plaintiffs have nevertheless attacked the integration clauses and the contracts themselves on a couple of grounds.

■ First, plaintiffs claim they never read the integration clauses before signing the contracts. (Doc. 163, pp. 8–9, 31.) In their affidavits, plaintiffs maintain that DSAs and other documents were routinely presented to them for their signatures without any explanation of the "fine print," including the integration clauses. (*See, e.g.*, Wayman's Affidavit, ¶ 5.) This claim is contradicted by the evidence. In sworn depositions, a number of the plaintiffs testified that they read and/or had their lawyers read their original DSAs before signing them. (Conner's Depo., p. 116; Botkin's Depo., pp. 92–93; J. McKown's Depo., pp. 47–48; Howell's Depo., pp. 232–33.) Moreover, even if plaintiffs did not read or understand the integration clauses, "[i]t is a well-established rule of law that contracting parties have a duty to learn the contents of a written contract before signing it, and such duty includes reading the contract and obtaining an explanation of its terms." *Albers v. Nelson*, 248 Kan. 575, 578–79, 809 P.2d 1194 (1991); *see also Flight Concepts Ltd. Partnership v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir.1994) ("It was Mr. O'Quinn's duty to read and understand the provisions of the Licensing Agreement. A party cannot void a contract by claiming to be ignorant of its contents.") (citing *Albers* ). The law does not reward a commercial party for not having enough sense to read and understand a contract in its entirety before signing it.

■ Second, plaintiffs claim that the contracts in which the integration clauses are found are contracts of adhesion and, to the extent they allow Amoco to act in bad faith, are unconscionable. (Doc. 163, p. 91.) Both the doctrine of unconscionability and the doctrine of adhesion contracts are concerned with unfairness and one-sidedness in a contract as a result of unequal bargaining power.

> An adhesion contract is a "[s]tandardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract."

*Anderson v. Union Pacific R.R. Co.*, 14 Kan. App.2d 342, 346, 790 P.2d 438 (1990) (quoting Black's Law Dictionary 38 (5th ed. 1979)).[11] The Amoco dealers in *Abbott* asserted that the DSAs were contracts of adhesion because they had no say in any of the terms of the agreement and they were required to accept Amoco's terms if they wanted to become franchisees. 249 Ill.App.3d at 780, 189 Ill. Dec. at 93, 619 N.E.2d at 794. The Illinois appellate court, however, found that "even if the DSA's are adhesion contracts, it does not follow that they are unenforceable." *Id.* The court simply construed the contract against "the more powerful party." *Id.* at 781, 189 Ill.Dec. at 94, 619 N.E.2d at 795. The court acknowledged that "some contracts may be so one-sided as to be utterly unenforceable," but concluded that the dealers had not sufficiently alleged how the DSAs were so "one-sided" or how Amoco had taken "unfair advantage" of them. *Id.*

■ With respect to plaintiffs' unconscionability argument, UCC § 2–302 provides:

---

11. The classic example of an adhesion contract is an insurance contract. *Western Casualty & Surety Co. v. Budig*, 213 Kan. 517, 518–19, 516 P.2d 939 (1973).

If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

K.S.A. § 84–2–302.

The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principle is one of the prevention of oppression and unfair surprise ... and not of disturbance of allocation of risks because of superior bargaining power....

Comment to K.S.A. § 84–3–202. "[U]nless the provision in question is, under the circumstances, so outrageous and unfair in its wording or its application that its shocks the conscience or offends the sensibilities of the court, or is against public policy, it must be enforced." *Adams v. John Deere Co.*, 13 Kan.App.2d 489, 492, 774 P.2d 355 (1989). There are "a number of factors or elements" to consider, including:

(1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate; and (10) inequality of bargaining or economic power.

*Wille v. Southwestern Bell·Tel. Co.*, 219 Kan. 755, 758–59, 549 P.2d 903 (1976) (citations omitted).

In this case, there is evidence that the DSAs and other contracts between the parties have some of the attributes of adhesion contracts. Amoco territory managers presented the contracts to plaintiffs as standardized, pre-printed forms that each plaintiff had to sign, and, from a negotiating standpoint, Amoco clearly had greater bargaining power than plaintiffs. Nevertheless, the court does not find that the contracts are so "one-sided" or unfair as to render either the integration clauses or the contracts themselves unenforceable. Even construing the standardized contracts strictly against Amoco and in the light most favorable to plaintiffs, there is nothing that could reasonably be considered shockingly unfair or offensive about the wording of the contracts or the inclusion of the integration clauses therein. Standardized contracts with integration clauses have been a common part of plaintiffs' and Amoco's franchise relationship. *See Adams*, 13 Kan.App.2d at 497, 774 P.2d 355 (holding that "no-lost-profits clause" in parties' agreement was not unconscionable as a matter of law in part because similar clause had been in the agreement between the parties for years). In addition, this case does not involve the stark inequality that typifies cases in which clauses are deemed unconscionable. Plaintiffs are not unsophisticated and unsuspecting consumers; they are experienced businessmen, some of whom were aided by legal counsel. Some appear to be quite successful. This simply is not one of those cases that smacks of such gross unfairness that a contract or portion thereof must be declared unenforceable.

6. *Is Amoco estopped from relying on the integration clauses, parol evidence rule, and/or statute of frauds in the present case?*

Finally, having thoroughly reviewed the plaintiffs' contentions with respect to Count

I, the court feels compelled to *sua sponte* consider one more possible argument against summary judgment: equitable estoppel.[12]

There are a number of recognized doctrines under which a party is estopped from relying on integration clauses, the parol evidence rule, or the statute of frauds to preclude evidence of an additional term or agreement. One of these doctrines is expressed in UCC § 2–209(3)(b): "A contract which does not satisfy the requirements of subsection (1) [the statute of frauds] but which is valid in other respects is enforceable ... if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made." Others are among the "general principles of law" which "supplement" the UCC's provisions. K.S.A. § 84–1–103 (referring specifically to "estoppel").

In this case, Amoco has not admitted that it entered into the alleged DFC/DBP offset agreement with plaintiffs. However, it has affirmatively stated in its pleadings in another action involving the DFC program that it is giving its dealers a DBP offset.

When Amoco first instituted its DFC program, a potential conflict arose in the State of Maryland where the state legislature had proposed bills prohibiting fees on dealers for credit card sales. On July 2, 1982, Amoco filed an action in the United States District Court in Maryland seeking declaratory relief and an injunction with respect to this proposed legislation. (Doc. 164, Ex. 8, *Amoco Oil Co. v. Hughes.*) Amoco contended that the legislation was preempted by a federal law specifically authorizing discounts aimed at inducing payment by cash. Amoco made a number of representations concerning how the DFC program worked. Most notably, Amoco stated:

> Amoco's Discount for Cash Program achieves an "unbundling" of the price of gasoline and credit and consequent lowering of the price of gasoline to the dealer. Under the program, Amoco charges the Amoco dealer a credit card processing fee of 4% on each credit card transaction, re-

flecting the cost to Amoco of extending credit and administering the credit card program. Simultaneously, Amoco *lowers the dealer buyer price* of gasoline by an amount reflecting the revenues derived from the credit card processing fee. In effect, Amoco takes the cost of the credit card system out of the price of its gasoline.

(Doc. 164, Ex. 8, Memorandum in Support of Motion for TRO, p. 4.) This statement appears to support plaintiffs' allegation that Amoco promised to give them a DBP offset in exchange for their participation in the DFC program and paying a fee on each credit card transaction.

In the court's view, it is arguable that Amoco's representation in the Maryland case estops it from relying on the integration clauses, the parol evidence rule, or the statute of frauds to preclude evidence of the alleged DFC/DBP offset agreement in the present case. Amoco cannot tell one court that it lowers its DBP in connection with the DFC program, and then argue in another court that any evidence that it ever promised to lower the DBP in connection with the DFC program is inadmissible.

The parties will be permitted to brief this discrete issue in the manner ordered, *infra.*

## II. *COUNT II: Misrepresentation—Discount for Cash Program*

In Count II of their Amended Complaint, plaintiffs allege that

(1) Amoco advised plaintiffs that if plaintiffs would accept and utilize a discount for cash pricing strategy to attract cash customers, Amoco would reduce its price of motor fuel to plaintiffs by 2.8¢ per gallon, later changed to 2.1¢ per gallon when the credit card fee was reduced from 4% to 3%;

(2) Plaintiffs relied upon these representations when investing in their businesses; making changes in their gasoline and other marketing practices; and when accepting Amoco's various marketing programs and agreements;

---

**12.** Plaintiffs mention "promissory estoppel" in their response but do not address the kind of estoppel to which the court now refers. (Doc. 163, pp. 93–98.) Amoco's reply appears in Doc. 190, pp. 21–22.

(3) Through price manipulations and its pricing strategy, Amoco's promised discount was knowingly illusory, and/or Amoco did not actually pass on the discount to plaintiffs, and Amoco's representations were false; and

(4) Amoco has consistently and repeatedly sold motor fuel to plaintiffs contrary to Amoco's representations regarding the discount.

(Doc. 75, ¶¶ 39–42.)

 The gist of plaintiffs' misrepresentation or fraud claim is that Amoco promised to give a DFC/DBP offset but did not. It is essentially a "fraudulent promise of future events" claim, the elements of which are as follows: (1) a promise which the promisor never intends to keep and makes with intent to deceive and induce the promisee to act upon the promise; (2) reasonable and detrimental reliance on the promise by the promisee; and (3) ultimate failure to perform by the promisor. *Anderson v. Heartland Oil & Gas, Inc.*, 249 Kan. 458, 469, 819 P.2d 1192 (1991) (citing PIK Civ.2d 14.41). To recover, a plaintiff must prove each of these elements. Amoco contends that it is entitled to summary judgment on Count II because, *inter alia,* plaintiffs cannot establish that their alleged reliance on defendant's alleged misrepresentations was either *reasonable* or *detrimental.*

First, Amoco argues that reliance on an alleged oral misrepresentation is *unreasonable* as a matter of law where the parties' written contract contains an integration clause disavowing any reliance on promises outside the contract. (Doc. 126 at 33–35.) Amoco relies heavily on *Flight Concepts Ltd. Partnership v. Boeing Co.*, 819 F.Supp. 1535 (D.Kan.1993), *aff'd,* 38 F.3d 1152 (10th Cir. 1994).

In *Flight Concepts,* the parties entered into a written license agreement pertaining to the development of an airplane. The agreement could be terminated at any time by Boeing. After Boeing terminated the agreement, Flight Concepts sued contending, *inter alia,* that it signed the agreement based upon Boeing's alleged representation that it would spend large amounts of money to develop one airplane. The district court granted summary judgment to Boeing on two grounds: (1) the alleged representations were not in the written agreement and reliance upon them was foreclosed by the integration and disclaimer clauses of the agreement and (2) it was unreasonable for Flight Concepts to rely upon representations about future events when it signed a contract terminable at will by Boeing (819 F.Supp. at 1549–50). The Tenth Circuit affirmed, citing ground (2): "The Licensing Agreement released [Boeing] from any obligation to produce aircraft. The fact that the written contract conflicts directly with any oral promises [Boeing] employees made concurrently erases any effect of those oral promises from the Agreement." 38 F.3d at 1157.

Plaintiffs counter with *Inter–Americas Ins. Corp., Inc. v. Xycor Systems, Inc.,* 757 F.Supp. 1213 (D.Kan.1991), where Judge Crow refused to grant summary judgment to defendant, even though plaintiff's fraud claim was "not a model pleading." He also observed that "most of defendants' motion is riddled with genuine issues of material fact." He rejected defendants' integration clause argument, citing the "... well-recognized exception to the parol evidence rule which permits the use of evidence of fraudulent representations made during the course of negotiations where a contract is procured or induced by the fraudulent representation of one of the parties which were relied upon by the other." (*Id.* at 1222.) The case is not helpful to plaintiffs.

The evidence, viewed most favorably to plaintiffs, is that the alleged representations regarding a discount did not occur as part of any "negotiations" over the terms of the DSAs. Indeed, plaintiffs allege in paragraph 34 of their amended complaint that the contracts "... are not negotiated and are and were offered to plaintiffs on a non-negotiable take-it-or-leave-it basis." Plaintiffs have not retreated from this allegation in their lengthy response to Amoco's motion. (Doc. 163.)

Since one does not negotiate an "adhesion" contract, it makes no difference whether, at the time a particular plaintiff signed its DSA, Amoco had failed in the past to give the

promised discount or whether Amoco reneged on a promised future discount. Simply put, plaintiffs cannot, on one hand, claim reasonable reliance upon Amoco's alleged fraudulent "discount" representations while, on the other hand, claiming that they had no choice in whether to sign the agreements as written which contain no mention of a DFC/DBP offset but do contain integration clauses.[13]

Second, according to Amoco, plaintiffs' deposition testimony belies any assertion that their alleged reliance on defendant's alleged misrepresentations was *detrimental.* Amoco directs the court to portions of plaintiffs' testimony in which plaintiffs admit that, if they wished to remain Amoco dealers, they had no choice but to accept the DFC program irrespective of any representations made by Amoco. (Docs. 192–93: *See, e.g.,* Wayman Depo. II, pp. 45–47; Stanislaus Depo. II, p. 43; Smith Depo. II, pp. 41–42; Roat Depo. II, p. 52; Rhodes Depo., pp. 264–65; J. McKown Depo. II, p. 60; McClernon Depo. II, pp. 47–48.) Amoco argues that, having made these admissions, plaintiffs cannot establish that their alleged reliance was in fact detrimental—that is, that they would have (or could have) done something different had Amoco not allegedly misrepresented its DFC program. As support, Amoco cites *Remus v. Amoco Oil Co.,* 794 F.2d 1238 (7th Cir.1986), which involved a misrepresentation claim virtually identical to the claim set forth in the present case.

In *Remus,* a Wisconsin Amoco dealer alleged that Amoco had misrepresented the terms of its DFC program by promising that each dealer would receive a "financially meaningful 'discount'" from the wholesale price" at which the dealer purchased gasoline from Amoco.[14] The trial court granted Amoco summary judgment and the Seventh Circuit affirmed, stating:

[Remus's] claim that Amoco used misrepresentations to get him to go along with the discount for cash program would be important only if we accepted Amoco's argument that Remus had a choice; we don't, so it isn't....

Remus had no real choice. As long as some Amoco dealers passed on Amoco's wholesale price reduction to consumers in order to get more cash customers, competition would force the others to follow suit unless they wanted to lose their cash customers.... Remus therefore had no alternative (at least if he wanted to remain an Amoco dealer).

*Id.* at 1241–42, 1239.

Here, plaintiffs, like the dealers in *Remus,* had no choice but to go along with Amoco's DFC program, regardless whether Amoco promised a reduction in the DBP. Similarly, accepting plaintiffs' allegations at face value and further accepting as true plaintiffs' testimony that they *had to sign* the DSAs ("adhesion contracts," according to the amended complaint) if they wanted to be Amoco dealers, plaintiffs cannot be said to have detrimentally relied on Amoco's alleged representation that they would receive a DFC/DBP offset because, even if such a representation had been made, plaintiffs still would have effectively been forced to implement the DFC program and sign the contract. In other words, a causal connection between the alleged misrepresentation and the plaintiffs' alleged damages—a connection that depends on evidence that, but for the misrepresentation, plaintiffs would not have taken the action they did—cannot be made. *See Slaymaker v. Westgate State Bank,* 241 Kan. 525, 532, 739 P.2d 444 (1987) (holding misrepresentation must at least be partial cause of plaintiff's injury). Hence, plaintiffs' misrep-

---

**13.** Plaintiffs' argument about not being given the promised DFC discount has been made in one form or another by many other Amoco dealers. *See, e.g., Remus v. Amoco,* 611 F.Supp. 885 (D.Wis.1985), *aff'd,* 794 F.2d 1238 (7th Cir.1986), and *Montgomery v. Amoco,* 804 F.2d 1000 (7th Cir.1986). The court cannot help but wonder whether some or all of the plaintiffs in this case were aware that other Amoco dealers had chal-

lenged the DFC program when they signed DSAs.

**14.** Remus also alleged that Amoco had violated the Wisconsin Fair Dealership Law and, interestingly, that Amoco had breached the credit card contract by charging for the credit card program. Summary judgment was granted and upheld on both of those claims.

resentation claim necessarily fails.[15]

## III. *COUNT III: Breach of Contract— UCC § 2–305(2)*

█ In Count III of their amended complaint, plaintiffs allege that Amoco did not set its DBP in "good faith" and "a commercially reasonable manner" as required by UCC §§ 2–305(2) and 2–103(1)(b):

> A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.
>
> . . . .
>
> "Good faith" in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.

K.S.A. §§ 84–2–305(2) & 84–2–103(1)(b).

The DSAs identify the purchase price for gasoline as Amoco's DBP "in effect." (Doc. 164, Ex. 5, DSAs ¶ 4.) Amoco contends that it is entitled to summary judgment on Count III because, under Official Comment 3 to UCC § 2–305(2), a "price in effect" is by definition a price set in good faith: "[I]n the normal case a 'posted price' or a future seller's or buyer's 'given price,' *'price in effect,'* 'market price,' or the like satisfies the good faith requirement." K.S.A. § 84–2–305, Official UCC Comment, ¶ 3, sent. 3 (emphasis added). This provision apparently reflects a belief that § 2–305(2) should not require suppliers in industries where "price in effect"-type contracts are often used to establish that the price ultimately charged was a reasonable one.

> [T]here are a great many industries where sales are not made at fixed prices. For example, ... in the steel industry, practically every contract we make for the sale of goods is made under a provision that says, "The price shall be the seller's price in effect at the time of shipment." . . . .

If this Section [UCC § 2–305(2)] is to apply to that kind of transaction, it means that in every case the seller is going to be in a lawsuit, I'm afraid, or he could be, because there isn't any outside standard at all. . . .

I think this Section ought to be amended. One way of doing it would be to add to the Section as it now is, a sentence reading like this:

> An agreement to the effect that the price shall be or be adjusted to, or be based upon, or determined by reference to the seller's going price, price in effect, regular price, market price, established price, or the like, at the time of the agreement or at any earlier or later time, is not an agreement to which this subsection is applicable.

That is one way of doing it. It could be done in the affirmative, perhaps, by saying,

> An agreement such as this is an agreement under which the seller or the buyer does not have any burden of showing anything other than that he has not singled out the particular other party for discrimination.

The interpretation of the industry on these kinds of agreements is just about that, that what they mean is that when you come to fix the price on a particular contract, you do not discriminate against this particular purchaser. . . .

I think it is of tremendous importance to the industry that this Section be so put that it is clear that we do not have to establish that we are fixing reasonable prices, because that gets you into rate of return of profit, whether you are using borrowed money, and all those questions.

(Statement of Bernard Broeker, Member of UCC Drafting Committee, Proceedings of the Enlarged Editorial Board of the American Law Institute, Jan. 28, 1951, Doc. 128, Ex. 6, pp. 193–95.)[16] It is abundantly clear

---

**15.** The Court finds it unnecessary to discuss Amoco's grounds that the amended complaint is insufficient, that plaintiffs have admitted they knew they were not receiving the discounts and that plaintiffs have admitted Amoco was never dishonest with them. (Doc. 126, pp. 32–33, 37–39.)

**16.** Mr. Broeker's comments were apparently the impetus for the Official Comment 3.

[T]he Reporters and Editorial Board approved in principle both suggestions made by Mr. Broeker but the Reporters wished to revise the specific language suggested. The Reporters did not object to preserving sellers' standard

from these statements that the chief concern of the UCC Drafting Committee in adopting § 2–305(2) was to prevent *discriminatory* pricing—i.e., to prevent suppliers from charging two buyers with identical pricing provisions in their respective contracts different prices for arbitrary or discriminatory reasons. No such discriminatory pricing allegations are made in the present case. On the contrary, it is undisputed that all of the plaintiffs paid the same price for gasoline purchased from Amoco. Plaintiffs do not allege that they were treated differently than other similarly situated dealers. Hence, the present case would not appear to fall within the intended scope of § 2–305(2).

Plaintiffs nevertheless argue that this case deserves special treatment because it is not the "normal case" contemplated by Comment 3. As support for this proposition, plaintiffs rely on three cases: *Columbus Milk Producers' Coop. v. Dept. of Agriculture,* 48 Wis.2d 451, 180 N.W.2d 617 (1970); *Nanakuli Paving & Rock Co. v. Shell Oil Co., Inc.,* 664 F.2d 772 (9th Cir.1981); and *E.S. Bills, Inc. v. Tzucanow,* 38 Cal.3d 824, 215 Cal.Rptr. 278, 700 P.2d 1280 (1985).

*Columbus Milk Producers* is inapposite. There, milk producers claimed their cooperative had breached an implied contract to pay them the competitive price for milk in the area. 180 N.W.2d at 620. There was no written contract and no "price in effect" or similar contract language. Official Comment 3 was not discussed.

*Tzucanow* is likewise inapposite. In that case, there was evidence that a gasoline distributor was acting in bad faith and charging a dealer excessive gasoline prices in order to drive the dealer out of business and enable the distributor to operate the dealer's station directly. 215 Cal.Rptr. 278, 700 P.2d at 1283. The parties' contract identified the price for gasoline as the "applicable Dealer Purchase Price," and this was interpreted to be an open price term within the meaning of UCC § 2–305(2). *Id.* at 281, 700 P.2d at 1286. There was no suggestion that the purchase price was a "price in effect" nor any mention of Official Comment 3.

prices but want the language to avoid discriminatory prices.

Plaintiffs are thus left, once again, to rely on *Nanakuli.* As discussed *supra,* in that case, the Ninth Circuit found that evidence of usage of trade and course of dealing was admissible to show the existence of a price protection term in an asphalt supply contract. Nanakuli also offered "an alternative theory why Shell should have offered price protection." *Id.* at 805. This alternative theory was premised on Shell's obligation under UCC § 2–305(2) to set its prices in good faith. The Ninth Circuit analyzed this theory as follows:

> Even if price protection was not a term of the agreement, Shell could not have exercised good faith in carrying out its 1969 contract with Nanakuli when it raised its price by $32 effective January 1 in a letter written December 31st and only received on January 4, given the universal practice of advance notice of such an increase in the asphaltic paving trade. The Code provides, "A price to be fixed by the seller or by the buyer means a price for him to fix in good faith," Haw.Rev.Stat. § 490:2–305(2). For a merchant good faith means "the observance of reasonable commercial standards of fair dealing in the trade." *Id.* 490:2–103(1)(b). The comment to Section 2–305 explains, "(I)n the normal case a 'posted price' … satisfies the good faith requirement." *Id.,* Comment 3. However, the words "in the normal case" mean that, although a posted price will usually be satisfactory, it will not be so under all circumstances. In addition, the dispute here was not over the amount of the increase—that is, the price that the seller fixed—but over the manner in which that increase was put into effect. It is true that Shell, in order to observe the good faith standards of the trade in 1974, was not bound by the practices of aggregate companies, which did not labor under the same disabilities as did asphalt suppliers in 1974. However, Nanakuli presented evidence that Chevron, in raising its price to $76, gave at least six weeks' advance notice, in accord with the long-time usage of the asphaltic paving trade. Shell, on the

(Report of the Chairman of the ABA Committee on the Proposed UCC, Doc. 128, Ex. 9, p. 186.)

other hand, gave absolutely no notice, from which the jury could have concluded that Shell's manner of carrying out the price increase of 1974 did not conform to commercially reasonable standards. In both the timing of the announcement and its refusal to protect work already bid at the old price, Shell could be found to have breached the obligation of good faith imposed by the Code on all merchants. "Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement," *id.* § 490:1–203, which for merchants entails the observance of commercially reasonable standards of fair dealing in the trade. The Comment to 1–203 reads:

> This section sets forth a basic principle running throughout this Act. The principle involved is that in commercial transactions good faith is required in the performance and enforcement of all agreements or duties. Particular applications of this general principle appear in specific provisions of the Act.... It is further implemented by Section 1–205 on course of dealing and usage of trade.

*Id.* § 490:1–203, Comment. Chevron's conduct in 1974 offered enough relevant evidence of commercially reasonable standards of fair dealing in the asphalt trade in Hawaii in 1974 for the jury to find that Shell's failure to give sufficient advance notice and price protect Nanakuli after the imposition of the new price did not conform to good faith dealings in Hawaii at that time.

Because the jury could have found for Nanakuli on its price protection claim under either theory, we reverse the judgment of the District Court and reinstate the jury verdict for Nanakuli....

*Id.* at 805–06.

Significantly, Circuit Judge Anthony M. Kennedy, now a Justice of the United States Supreme Court, issued a special concurrence noting that Nanakuli's good faith claim was dependent on the clear evidence of trade usage and custom admitted under UCC § 2–202(a):

> Our opinion should not be interpreted to permit juries to import price protection or a similarly specific contract term from a concept of good faith that is not based on well-established custom and usage or other objective standards of which the parties had clear notice. Here, evidence of custom and usage regarding price protection in the asphaltic paving trade was not contradicted in major respects, and the jury could find that the parties knew or should have known of the practice at the time of making the contract. In my view, these are necessary predicates for either theory of the case, namely, interpretation of the contract based on the course of its performance or a finding that good faith required the seller to hold the price.

*Id.* at 806 (Kennedy, J., concurring specially).

In the court's view, *Nanakuli* is of little assistance to plaintiffs in substantiating their UCC § 2–305(2) claims. As the Ninth Circuit itself noted, the facts in *Nanakuli* did not directly implicate UCC § 2–305(2) and Comment 3: "[T]he dispute was not over the amount of the increase—that is, the price that the seller fixed—but over the manner in which that increase was put into effect." *Id.* at 805. That is, the dispute was not really about good faith in setting the price of asphalt; rather, it was about whether good faith, in light of evidence concerning the prevailing practices in the asphalt industry, required Shell to give notice and price protection to Nanakuli. (See Justice Kennedy's caveat, quoted *supra.*) The present case, by contrast, *does* specifically concern good faith in price setting, the focal point of UCC § 2–305(2).

*Nanakuli* is also of little value in interpreting the meaning of Official Comment 3. The Ninth Circuit's comment that "in the normal case" means that "posted price" and "price in effect" language does not satisfy good faith "under all circumstances" does nothing more than state the utterly obvious. 664 F.2d at 805. The Ninth Circuit made no effort to delineate those "circumstances" which take a case out of the purview of Official Comment 3. The Ninth Circuit merely held that the "circumstances" in *Nanakuli,* where there was substantial evidence that everyone else in the industry was doing what Shell had failed to do, were not those of a "normal

case." Similar circumstances do not exist here.[17]

Amoco cites several cases rejecting breach of good faith claims or § 2–305(2) claims that involved "price in effect"—type contracts. Only one of these cases, *Richard Short Oil, Inc. v. Texaco, Inc.,* 799 F.2d 415, 422 (8th Cir.1986), actually discusses Official Comment 3, the basis for summary judgment asserted here. In that case, plaintiff Short Oil was under contract to purchase gasoline from defendant Texaco and distribute it to Texaco retail outlets. Short could not sell Texaco gasoline to non-Texaco dealers,[18] but was free to purchase gasoline from other suppliers. *Id.* at 417–18. Texaco began a nationwide rebate program whereby distributors, like Short, and retail service stations whose monthly gasoline purchases from Texaco exceeded a certain percentage of their purchases during a base period received a price reduction on subsequent purchases of gasoline. *Id.* About eight months later, Texaco put a ceiling on such rebates for distributors only; the ceiling did not apply to retailers. Short filed suit asserting, *inter alia,* that Texaco had breached its implied covenant of good faith and fair dealing by discriminatorily applying its rebate program between distributors and retailers. *Id.* at 421. The district court directed a verdict against Short on this particular claim, "finding [the] evidence deficient in either showing dishonesty or bad motive on the part of Texaco to injure Short by implementation of its rebate program and its subsequent ceiling to the rebate program." *Id.* at 418. The Eighth Circuit affirmed on the same ground. *Id.* at 422. However, the Eighth Circuit also offered another reason why Short's lack of good faith claim failed, a reason relevant to the present case:

> In addition, it is apparent that the Uniform Commercial Code provisions on establishing an open price term provide a basis to conclude that Texaco did not act in bad faith when it introduced the cap on its rebate program. Section 85–2–305(2) of

the Arkansas Annotated Statutes states that the price fixed by the seller means a price fixed in good faith. Official Comment 3 to § 85–2–305 adds that in the normal case a "posted price" satisfies the good faith requirement. *Id.* Texaco's posted price, offered to all its distributors nationwide, therefore appears to satisfy § 85–2–305(2). Moreover, when Short was free to buy from others if Texaco would not match prices offered by these other sellers, while Texaco was bound to fill Short's requirements whenever it so demanded, demonstrates there could be no claim of bad faith based on § 85–2–305(2).

*Id.*

Plaintiffs contend that the *Richard Short Oil* case is distinguishable because, as the Eighth Circuit noted, it did not involve a "captive buyer" situation. That is, unlike plaintiffs, Short could have obtained gasoline from a supplier other than the defendant. Plaintiffs contend that the "captive buyer" situation is not a "normal case" within the meaning of Official Comment 3. However, plaintiffs offer no authority for this proposition, and, guided by the history behind Official Comment 3 and *Nanakuli, supra,* this court believes the present case *is* a "normal case." If there was evidence that Amoco had, for example, engaged in discriminatory pricing or tried to run plaintiffs out of business, then the court's decision might be different.

Plaintiffs also contend that even if this is a "normal case" and Official Comment 3 does apply, there is still a question of fact as to whether Amoco exercised good faith. Here, plaintiffs once again attempt to distinguish *Richard Short Oil,* noting that, in addition to relying on Official Comment 3, the Eighth Circuit found insufficient evidence of bad faith. *See* 799 F.2d at 422. Plaintiffs argue:

> [I]f the plaintiff in *Richard Short Oil* had produced evidence in support of its good faith claim, the court's conclusion that Tex-

---

**17.** *Nanakuli* certainly does not establish that plaintiffs' "captive buyer" situation is not a normal case. Plaintiffs have offered no authority for that proposition.

**18.** Short admittedly violated this part of its agreement with Texaco, *id.* at 418, and the Eighth Circuit viewed this bad faith on Short's part as significantly undermining its bad faith claims against Texaco, *id.* at 423.

aco's posted price satisfied 2–305 would have been different, and the case hardly stands for the proposition that mere use of "posted price" regardless of the facts and circumstances involved, satisfies the good faith requirements of 2–305.

(Doc. 163, pp. 120–21.)

Plaintiffs assert that there is more evidence of bad faith in the present case than there was in *Richard Short Oil.* But the lack of evidence of bad faith in *Richard Short Oil* was simply an alternative basis for summary judgment. The application of Official Comment 3 stands on its own and is quite clear. So long as this is a "normal case"— and the court has determined that it is— Amoco's "price in effect" satisfies its good faith obligations under UCC § 2–305(2). To hold otherwise would be to open the can of worms that Mr. Broeker and the other members of the Drafting Committee obviously wished to keep closed.

### IV. *COUNT IV: Breach of Lease—Investment Value Rent Program*

In Count IV of their Amended Complaint, plaintiffs claim that Amoco has "improperly and unreasonably calculated" their rents and thereby breached both the express terms of its lease agreements with plaintiffs and the implied covenant of good faith and fair dealing. (Doc. 75, ¶ 58.) Plaintiffs' allegations in support of this claim focus on various aspects of the Investment Value Rent Program (IVR). First, plaintiffs claim that some of the components of the IVR program are improper. For example, several of the plaintiffs (those who are assessed special rent for the use of service bays) claim that IVR should not include a component for service bays because they are already being charged separate and additional rent for the use of service bays. (Doc. 75, ¶ 55.) Second, plaintiffs claim that Amoco's capital assets ledgers, the basis for calculating plaintiffs' rent under IVR, are in error:

The Capital Asset Ledger for each premises leased by several of the plaintiffs contained duplicitous entries; inflated appraisals or values; entries for items which no longer exist on the premises; and items

which are or were the property of the individual plaintiffs and not Amoco.

*Id.* at ¶ 57.

Amoco contends that it is entitled to summary judgment or Count IV for reasons similar to those asserted with respect to Count I. Amoco argues that plaintiffs' claims are contradicted by the express terms of the Lease Agreement under which "plaintiffs agreed to pay Amoco a specific amount of rent for the three-year term of each Lease" and that evidence of any other obligations, agreements, or understandings is inadmissible by virtue of the integration clause. (Doc. 126, pp. 47–48.)

Plaintiffs respond by pointing to the "Modification of Rental" term in the Lease Agreement, which states:

In the event that the original term of this Lease is for more than one year, each year of said term Lessor reserves the right to modify the monthly rental specified above to conform with Lessor's *established policy rental in effect* for this type facility as of each anniversary date of the commencement of the term by giving Lessee at least ninety (90) days' advance written notice of such changed rental, and Lessee shall have the right at any time during said ninety (90) day period to terminate this Lease upon giving Lessor fifteen (15) days' notice in writing.

(Doc. 128, Ex. 1b, ¶ 5) (emphasis added). Based on this provision, plaintiffs argue that

[T]he Lease do[es] not give Amoco the unfettered right to set the rent at any level it pleases, but rather requires Amoco to act within an "established policy" rental which is "in effect." This "policy" is not set forth anywhere within the terms of the Lease, and is wholly undefined. The term is ambiguous and parol evidence should be admissible to determine what is entailed in such "policy."

(Doc. 163, p. 134.) Plaintiffs further contend that "because the Lease provides that the rent must be set according to a 'policy,' rental modification clearly involves the duty of good faith and fair dealing ... [which] controls a party in the exercise of contractual discretion." *Id.* at 135.

In reply, Amoco maintains that plaintiffs' "established policy" argument is contrary to both the terms of the lease agreement and plaintiffs' own amended complaint. According to Amoco, plaintiffs do not claim in Count IV that Amoco failed to follow its "established policy"—i.e., IVR—in *modifying* the express rent set forth in each Lease Agreement: "Plaintiffs' complaint now is that they do not like various parts of the IVR policy itself—not that Amoco has failed to apply the policy to any rent modifications." (Doc. 190, p. 46.) Second, Amoco argues that, "even if plaintiffs could now rewrite their complaint and sworn testimony to make such a claim, plaintiffs cannot show or establish that Amoco ever made any modifications to the stated rental amount that were not in accordance with Amoco's established IVR policy." *Id.*

Amoco dealers in other states have made breach of lease claims similar to plaintiffs' in at least two cases: (1) *Abbott v. Amoco Oil Co., supra,* 249 Ill.App.3d at 784–87, 189 Ill. Dec. at 96–98, 619 N.E.2d at 797–99; and (2) *Ervin v. Amoco Oil Co.,* 885 P.2d 246, 250–51 (Colo.App.1994), *aff'd in part, rev'd in part and remanded,* 908 P.2d 493 (Colo.1995).[19]

In *Abbott,* a group of Chicago area Amoco dealers alleged that Amoco

promised and represented to them that the rents it set in its leases would be based on the fair-market/investment value of the land and improvements at the leased facilities ... [and subsequently] ... failed to disclose information regarding the components of its rental charges; charged the dealers for capital improvements that had never existed at the property, had been removed, had been fully depreciated, were owned by the dealers, or were charged for under separate agreements; charged the dealers for signs which were supposed to be loaned free of charge; imposed duplicate charges for service bays and car washes; and required the dealers to pay for items such as property taxes and main-

tenance fees which were never incurred or were already reflected in other charges. 249 Ill.App.3d at 785, 189 Ill.Dec. at 97, 619 N.E.2d at 798. The dealers asserted that these actions constituted both a breach of the leases' express terms and a breach of the implied covenant of good faith and fair dealing.

The trial court granted Amoco's motion to dismiss the dealers' breach of lease claims. The Appellate Court of Illinois affirmed and the Illinois Supreme Court denied review. The appellate court found the dealers' breach of lease allegations insufficient, unsupported, and "directly inconsistent with the language of the leases." *Id.* The court focused on three paragraphs in the lease: (1) paragraph 4, which specifies the monthly rent amount; (2) paragraph 5, discussed *supra,* which provides for the "modification of rental" in accordance with an "established policy rental in effect"; and (3) paragraph 30, the integration clause. Based on these provisions, the court held:

The form leases executed by the dealers simply state an amount that a dealer must pay to Amoco as rent for its facility. The lease does not state the basis on which the rental charge is determined or what components are included in the rent....

Under the leases here, the dealers clearly agreed to pay Amoco a specified rental charge for their dealer facilities. They also allowed Amoco to modify the rent in future years under certain circumstances. Now, the dealers seek to read more terms into the leases in order to relieve themselves of the burden of what they apparently perceive to be bad bargains. This the law does not allow....

The dealers seek to have undocumented assertions and promises vary the terms of an unambiguous contract requiring any amendments to be made in writing and specifically disavowing that any outside representations were relied upon in its execution. This is contrary to Illinois law.

---

**19.** Upon being notified that *Ervin* was being appealed to the Colorado Supreme Court, the court and counsel agreed that this court should await the Supreme Court's decision before issuing its ruling on Amoco's motion. After the opinion was filed, the court gave the parties until January 5, 1996 to submit short memoranda regarding the decision's impact on this case. They have done so. (Docs. 220, 221.) Amoco, at least, has sought rehearing but the court has notified the parties that it will not withhold its ruling pending further review of the Supreme Court's decision.

*Id.* at 784–86, 189 Ill.Dec. at 96–97, 619 N.E.2d at 797–98 (citations omitted).

With respect to the covenant of good faith and fair dealing, the appellate court acknowledged that such a covenant is "implied in every contract in Illinois" and that it prohibits a party vested with discretion under a contract from exercising that discretion in an arbitrary and capricious manner. *Id.* at 786, 189 Ill.Dec. at 97, 619 N.E.2d at 798 (citations omitted). Nevertheless, the court once again found the dealers' allegations insufficient, unsupported, and inconsistent with the language of the lease:

> [T]he dealers must sufficiently allege bad faith or unfairness on the part of Amoco in order to show a breach of the implied covenant of good faith and fair dealing as it pertains to rental charges.
>
> The dealers have not pleaded that the rental charges caused financial trouble for their facilities or even alleged the size of the profit loss for which the overcharges were purportedly responsible. Neither have the dealers alleged that Amoco's rental policies were out of step with those of other oil companies or comparable business concerns.
>
> While we would agree that a plan by Amoco to profit at the dealers' expense by double charging for fixtures or services would point to bad faith by Amoco, the dealers offer no documents or factual allegations substantiating their overcharge claims. Moreover, the dealers' assertions that Amoco represented to them the basis on which it calculated rent or the individual charges for various fixtures are directly contradicted by the leases the dealers signed. *Finally, it is not even clear whether the dealers are complaining of the initial rental rates, which Amoco set and which the dealers agreed to pay in the contract, or whether the dealers feel cheated by subsequent modifications to the rent, which were within Amoco's discretion.* In short, the dealers seem to be alleging that an additional, contractual rent agreement exists between them and Amoco, separate

from the leases specifically embodying the parties' entire agreement. As we discussed, the dealers' breach of contract claim is foreclosed and we do not think that conclusory allegations of unfair dealing, without more, can provide the dealers with a remedy under the circumstances of this case.

*Id.* at 787, 189 Ill.Dec. at 98, 619 N.E.2d at 799 (citation omitted) (emphasis added).

In *Ervin,* Amoco appealed a jury verdict in favor of sixteen Colorado Amoco dealers who claimed, *inter alia,* that Amoco breached the implied duty of good faith and fair dealing in its lease agreements by charging double-rent for the use of service bays. 885 P.2d at 250–51. The trial court had dismissed several of the dealers' claims [20] but allowed a breach of lease claim predicated on the implied covenant of good faith and fair dealing and "limited to overcharges based upon rental charges for service bays" to go to the jury. *Id.* at 250. The Colorado court observed, as did the *Abbott* court, that "the covenant of good faith and fair dealing is implied at law in *every* contract" and that "this covenant must be tied to a specific contract term that allows for discretion on the part of either party." *Id.* at 250 (emphasis added) (citations omitted). The court examined paragraphs 4 and 5 of the parties' lease agreement and apparently concluded that, under paragraph 5, Amoco had been vested with discretion in the *modification* of rent. *Id.* at 250–51. The court rejected Amoco's position that "its collection of an unambiguous, expressly agreed upon rent could not constitute a breach of an implied duty of good faith and fair dealing," *id.* at 250, and instead held:

> Although requiring payment of the actual fixed monthly rental amount is non-discretionary, here, the dealers presented evidence to support the jury verdict including testimony that in addition to being charged a percentage of the value of the land and assets, which purportedly included the value of the service bays, they were charged a separate amount for the service

---

20. The Colorado dealers also asserted other claims similar to those asserted in the present case. In an April 18, 1994 letter to the court, counsel for Amoco notes that the dealers in *Ervin* "lost on all their gas pricing claims" and that the Colorado court "rejected as a matter of law the fiduciary duty claim made by these plaintiffs in Count VI."

bays. There was also testimony that this calculation method was not explained prior to the start of the present litigation.

Under the evidence presented, a jury could find that such covenant was breached. *Cf. Abbott v. Amoco Oil Co.*, 249 Ill. App.3d 774, 189 Ill.Dec. 88, 619 N.E.2d 789 (1993).

*Id.* at 251.

When *Ervin* reached the Colorado Supreme Court, that court summarized the dealers' allegations as follows:

The dealers claimed that Amoco breached its contractual obligations under the implied covenant of good faith and fair dealing by abusing its power, acting outside the scope of its discretion, and usurping the benefits of the agreements. Specifically, the complaint alleged that Amoco reserved discretion to make certain decisions, including establishing the purchase price for motor fuel, station rentals, station hours, and credit arrangements.[21] The dealers asserted that Amoco's use of the IVR Program for the internal calculation of rents resulted in redundant service bay charges. They claimed that, by charging twice for service bays, Amoco abused its discretion.[22] This abuse resulted in a breach of Amoco's implied duty of good faith and fair dealing.

Although the agreements were fully integrated, the trial court admitted parol evidence on the issue of breach of duty of good faith and fair dealing. The jury was instructed to enforce the agreements according to the reasonable expectations of the parties and determine rental overcharges for service bays based on the IVR method employed by Amoco. The jury found that Amoco breached its implied duty of good faith and fair dealing, rendered a verdict in favor of the dealers, and

awarded the dealers a total of $987,125 in "rental damages."

908 P.2d at 497.

The Supreme Court then summarized the Court of Appeals' decision insofar as it pertained to the lease agreement: [23]

On appeal, Amoco contended that the trial court's introduction of parol evidence in this case was improper because the lease agreements were unambiguous and fully integrated. *See Radiology Professional Corp. v. Trinidad Area Health Ass'n, Inc.*, 195 Colo. 253, 256, 577 P.2d 748, 750 (1978). Amoco argued that the trial court improperly allowed the jury to rewrite unambiguous and fully integrated lease agreements in three respects: (1) dealers were relieved of their obligation to pay rents and Amoco was precluded from collecting rents; (2) the rental amount was rewritten entirely; and (3) the paragraph barring both implied covenants and modifications absent written agreement of both parties was deleted.

The court of appeals rejected Amoco's arguments, holding that although "payment [by the dealers] of the actual fixed monthly rental amount is non-discretionary," Amoco retained discretionary authority to modify the rent charges. *Ervin*, 885 P.2d at 251. This authority, granted by contract, is circumscribed by the duty of good faith and fair dealing. See *id.* at 250–51. The court of appeals concluded that the dealers were being charged twice for service bay charges in the rental calculations, and a jury could conclude that the covenant of good faith and fair dealing was breached. *Id.* at 251. (Footnote references deleted.)

*Id.* at 497.

The Colorado Supreme Court affirmed the general rule that every contract contains an implied duty of good faith and fair dealing.

---

**21.** In this case, similar allegations are made in Count VI of the complaint.

**22.** In this case, similar allegations are made in Count IV *and* Count VI of the complaint. (Doc. 75, ¶¶ 68, 72.)

**23.** In their "Supplemental memorandum" (Doc 221) Plaintiffs urge the court to apply the Su-

preme Court's analysis of the lease agreements to Counts I and III of this case. The court declines to do so. The Supreme Court's discussion was limited to, and apparently influenced by, the evidence of "double charging." The Supreme Court was not presented with issues involving the DFC, which does not involve double charging.

The court went on to note that the duty applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price or time. The court then observed:

> Under the agreements, Amoco retained discretion to modify the monthly rental amount. The dealers depended upon the good faith of Amoco in setting the rental terms. Although the parties established specific rental figures at contract formation, they also decided to allow Amoco to modify rental terms. By allowing Amoco to adjust the rental terms the parties, in effect, left these future provisions open. The open rental terms required the dealers to depend upon Amoco's good faith. The general rule implying the covenant in every contract, combined with the specific discretion regarding rental terms, created a duty of good faith and fair dealing for Amoco.

*Id.* at 499.

The Colorado Supreme Court found that Amoco knew it was double-charging for the service bays, that the double charge was not disclosed to the dealers until 1988, that the dealers never agreed to be double-charged and finally:

> The dealers were justified in expecting that, in determining the appropriate rent, Amoco would not charge double for any one element of the calculation. That is, although the dealers left the rental calculation to Amoco's discretion, they presumably would not have signed the agreements had they known Amoco would charge a duplicate amount for service bays.

> The trial court properly instructed the jury regarding the implied covenant of good faith and fair dealing. The trial court informed the jury that "Colorado law provides that each contract has an implied covenant that parties shall act in good faith and deal fairly." The trial court further instructed the jury "that the law requires each party to a contract to act in such a manner that each party will attain their reasonable expectations under the contract." The evidence at trial supported the jury's finding that, by duplicate charging, Amoco did not perform the contracts to

the dealers' reasonable expectations. Considering its acknowledgment of franchisor-franchisee interdependence, the jury could have concluded that Amoco breached the implied covenant of good faith and fair dealing. On review, we will not disturb a properly instructed jury's findings of fact.

*Id.* at 499.

In a dissent, the Chief Justice cited to the Tenth Circuit's decision in *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259 (1988), and *Flight Concepts,* as follows:

> In *Big Horn,* the Court of Appeals for the Tenth Circuit explained:

>> Although good faith is generally applicable to all contract provisions, "it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant." ... In such a case the reason for invoking the provision is irrelevant. The reason may be purely a whim or caprice; all that matters is that proper notice is given. The rationale behind [this rule] is that the parties expressly contracted for the unconditional right and thus they cannot reasonably expect any special implied protection from terminating the contract other than the proper written notice.

*Big Horn,* 852 F.2d at 1267–68 (quoting *Tymshare, Inc. v. Covell,* 727 F.2d 1145, 1153 (D.C.Cir.1984) (Scalia, J.)) (emphasis added); accord *Flight Concepts Ltd. Partnership v. Boeing Co.,* 38 F.3d 1152, 1157 (10th Cir.1994) ("Although the doctrine is generally implied for all contract provisions, it is irrelevant where the contract is drawn so as to leave a decision to the 'uncontrolled' discretion of one of the parties."); *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 729 (10th Cir.1991).

I would apply the same reasoning employed by the Tenth Circuit in *Big Horn* to the instant case and hold that the implied covenant of good faith and fair dealing may not be utilized to limit the rent or modification provisions of the lease agreements in this case. The modification clause in the lease agreements gives Amoco absolute discretion to modify a dealer's rent so long

as Amoco gives adequate notice to the dealer. The reason for the modification is thus entirely irrelevant; the only duty imposed on Amoco by the express terms of the contract is to give notice to a dealer before modifying the rent. The Dealers should not now be permitted to maintain the untenable position that they did not reasonably expect Amoco to exercise this legal right under the lease agreements. To hold otherwise would allow the Dealers to use the jury as a tool to renegotiate the lease agreements after their legal formation. This would cut off Amoco's right to enter into any legal contract and to exercise its lawful rights thereunder. Here, Amoco exercised its right to offer lease property and equipment to the Dealer. Amoco had the right to make the offer on any terms it desired, whether subject to negotiation or not. Amoco was not legally bound to extend the offer, much less negotiate its terms. The Dealers then had the option, at their complete discretion, to accept or reject Amoco's offer. Once the Dealers accepted the offer, an express contract was formed, the rent and modification terms conveying absolute discretion to Amoco. In light of this unfettered discretion, I would hold, as a matter of law, that the Dealers could have had no reasonable expectation that Amoco would not exercise its legal right to modify the rent as provided in the lease agreement. I would thus hold that the implied covenant of good faith and fair dealing may not be utilized to limit the rent or modification provisions of the lease agreements in this case.

(*Id.* at 506–07) (footnote references deleted.)

As the *Ervin* dissent implies, the majority's holding does not square with Kansas law as interpreted by the Tenth Circuit in *Flight Concepts:*

> Plaintiffs correctly state that Kansas law reads an obligation to deal fairly and in good faith into almost every contract. *Bank IV Salina [v. Aetna Cas. Co.],* 810 F.Supp. [1196] at 1204 [D.Kan.1992]. The purpose of the good faith doctrine is to "protect the reasonable expectations of the parties." *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1267

(10th Cir.1988). The doctrine comes into play where a contract gives one party some discretion to implement a contract provision. Although the doctrine is generally implied for all contract provisions, *it is irrelevant where the contract is drawn so as to leave a decision to the "uncontrolled discretion" of one of the parties. Id. In such a case, the parties contracted to allow one of them the unconditional right to act, and an implied promise to deal fairly has no purpose. Id.* at 1268. Under the plain language of the contract BMAC has no obligation to perform, and plaintiffs have no right to terminate the contract for BMAC's nonperformance. We understand such language to allow BMAC "uncontrolled discretion" as to whether it will produce or sell Skyfox. BMAC's termination of the Licensing Agreement does not violate the parties' reasonable expectations.

38 F.3d at 1157 (emphasis added).

 The contract provisions in issue in this case read as follows:

"4. Rental. Lessee shall pay to Lessor as rent for the Premises, the sum of $_____ per month during the term of this Lease unless a variable monthly rental is indicated below:

5. Modification of Rental. In the event that the original term of this lease is for more than one year, each year of said term Lessor reserves the right to modify the monthly rental specified above to conform with Lessor's established policy rental in effect for this type facility as of each anniversary date of the commencement of the term by giving Lessee at least ninety (90) days' advance written notice of such changed rents, and Lessee shall have the right at any time during said ninety (90) day period to terminate this Lease upon giving *Lessor* fifteen (15) days notice in writing."

Plaintiffs correctly note that the term "Lessor's established policy rental" is not defined in the contract. Plaintiffs contend that the contract is therefore ambiguous and, relying upon *Ervin,* argue that a jury trial is necessary at which parol evidence would be received to demonstrate that Amoco breached

its duty of good faith and fair dealing in establishing and/or changing the amount of rent. (Doc. 163, pp. 134–35.) The court has problems with this argument.

The contract expressly reserves to Amoco the unilateral right to modify the monthly rental. There is nothing ambiguous about this right. The right is conditioned by only two things: (1) notice, which is not in issue and (2) conformance with *Amoco's* established policy rental. There is nothing in the contract which provides that the amount of rental or the "established policy rental" is subject to negotiation or arbitration. Modification is not controlled or guided by some event outside the contract relationship, the occurrence of which may present a jury issue. (Compare the coal purchase contract in *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d at 1261, 1266–70). These factors weigh in favor of a finding of "uncontrolled discretion" which would make the duty of good faith and fair dealing "irrelevant," to use the terminology of *Flight Concepts*.

The court is not persuaded by plaintiffs' argument that the absence of a definition of "established policy rental" creates an ambiguity. (Doc. 163, p. 134.) Plaintiffs cite no authority for the proposition that every term in a contract must be separately defined in order to avoid ambiguity and the court is aware of no such requirement.

 Judge Lungstrum recently defined ambiguity in *Hart v. Sprint Communications Co., L.P.*, 872 F.Supp. 848, 854 (D.Kan.1994):

> To be ambiguous, the contract must contain provisions or language of doubtful or conflicting meanings, as gleaned from the natural and reasonable interpretation of its language. An ambiguity does not appear until application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning. *All West Pet Supply Co. v. Hill's Pet Products Div., Colgate–Palmolive Co.*, 840 F.Supp. 1433, 1439 (D.Kan.1993); *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 248 Kan. 657, 810 P.2d 283, 285–86 (1991). A written contract is not am-

biguous unless two or more meanings can be construed from the contract provisions themselves. *Albers v. Nelson*, 248 Kan. 575, 578, 809 P.2d 1194 (1991).

The court finds no ambiguity from reading the contract as a whole regarding Amoco's right to modify a dealer's monthly rent. There is no multiplicity of meanings in the contract language.

Nonetheless, in the final analysis, the court finds that *Big Horn Coal Co.* may counsel against summary judgment on Count IV:

> [T]he "mere recitation of an express power" does not in itself preclude the implication of good faith requirements. *Tymshare*, 727 F.2d at 1153. "[T]o say that every expressly conferred contractual power" removes all the parties' unexpressed—but reasonable—expectations, would virtually "read the doctrine of good faith (or of implied contractual obligations and limitations) out of existence." *Id.* at 1154. We are convinced that an express power will preclude the requirements of good faith if the power leaves absolute and uncontrolled discretion to exercise the power in one of the parties and if the other party can have no reasonable expectation of any implied protection from the power's exercise other than procedural notice.[13]

852 F.2d at 1268.

The Circuit added in a footnote that

> A prime example of an express power that was subject to good faith requirements because it was not completely unfettered is found in *Tymshare*, an employee's compensation contract contained an express power that allowed Tymshare to change the term of a sales quota plan "within [its] sole discretion." *Tymshare*, 727 F.2d at 1154. The Court of Appeals for the District of Columbia found this power to be "not necessarily the equivalent" of a power that could be exercised "for any reason whatsoever, no matter how arbitrary or unreasonable." *Id.* Rather, the court found the power subject to good faith limitations because the employee would reasonably expect Tymshare not to "abuse its discretion" in changing the quota plan. Other

cases have also placed "good faith" limitations on express powers.

*Id.* at n. 13.

The allegations of Count IV differ from *Flight Concepts* where the issue was Boeing's unilateral right to terminate the contract for any reason. If Amoco's contract said it could raise a dealer's rent for "any reason", the inquiry would end. But that is not what the unambiguous contract says. The contract gives Amoco the discretion to raise a dealer's rent, upon notice, to conform with its "established policy rental in effect. . . ." The reasonableness of that policy is *not* the issue. This court specifically disagrees with *Ervin's* holding that a jury should be allowed to decide whether the dealers "presumably would not have signed the agreements had they known Amoco would charge a duplicate amount for service bays." To follow *Ervin* would be to let the jury rewrite the contract based upon parol testimony that plaintiffs would not have agreed to contract terms which were never negotiated or negotiable in the first place. Nevertheless, *Big Horn* seems to say that even though Amoco had unfettered power to establish the policy, plaintiffs retained the reasonable expectation that Amoco could not abuse its discretion in carrying out the policy. The court does not believe that *Flight Concepts* overrules *Big Horn* in this respect.

Beginning on paragraph 74 of their response memorandum (Doc. 163, p. 54), plaintiffs advance several "uncontroverted facts" regarding Amoco's failure to follow the IVR program. Amoco does not respond to each contention. Instead, it asserts generally that plaintiffs have never claimed that Amoco failed to follow its "established policy" but ". . . even if plaintiffs could now rewrite their complaint and sworn testimony to make such a claim, plaintiffs cannot show or establish that Amoco ever made any modifications to the stated rental amount which were not in accordance with Amoco's established IVR policy." (Doc. 190, pp. 45–46.)

The court is not persuaded by Amoco's first argument based upon its reading of Count IV of the Amended Complaint. (Doc. 75.) However, because of the overwhelming quantity of materials which have been submitted by the parties, the court cannot isolate the facts bearing on what the court emphasizes is a narrow issue: without resort to parol evidence or Amoco's good or bad faith in promulgating the "established policy rental [IVR] in effect," what evidence, if any, exists that Amoco abused its discretion in carrying out the "policy"? In other words, the issue is *not* whether Amoco made some promise which conflicts with the terms of the contract. The issue is *not*, for example, whether Amoco's "policy" to double-charge for service bays was "reasonable" or promulgated in the spirit of good faith and fair dealing (if, indeed, such was its policy). On the other hand, if Amoco's "policy" was not to double-charge, but it did so in contravention of the policy, such could be evidence of an abuse of discretion. The parties will be permitted to address this issue by supplemental memoranda. Plaintiffs must *specifically* identify Amoco's failure to follow its "policy" with appropriate citations to the record. Amoco will be permitted to respond. The parties must keep in mind that the court's objective is to determine whether disputed issues of fact exist on this narrow issue.

To head off any argument regarding the admissibility of such evidence (if it exists), the court does perceive a parol evidence problem. The evidence, if it exists, would not be received to set aside, explain or vary the terms of the contract. *See In re Estate of Girndt*, 225 Kan. 352, 354, 590 P.2d 1038 (1979), and *W–V Enterprises, Inc. v. Federal Savings & Loan Ins. Corp.*, 234 Kan. 354, 363, 673 P.2d 1112 (1983). Rather, the evidence merely goes to the issue of performance under the contract.

### V. COUNT V: Misrepresentation—Investment Value Rent Program

In Count V, plaintiffs claim that Amoco is liable for misrepresentations it made concerning the IVR Capital Asset Ledgers. Plaintiffs allege that:

(1) These Capital Asset Ledgers contained false information, inflated valuation and other improper entries, all of which resulted in several of the plaintiffs being overcharged for their rent;

(2) Amoco had knowledge of the improprieties and falsities contained in the Capital Asset Ledger, but has failed as of the date of this Amended Complaint to properly correct the same or properly recompense the plaintiffs;

(3) Amoco concealed, or endeavored to conceal, the contents of the Capital Asset Ledger from several of the plaintiffs;

(4) Amoco's actions in this regard were malicious, willful and reckless, and were intended to harm several of the plaintiffs and to enrich Amoco through collection of inflated rental charges; and

(5) Several of the plaintiffs detrimentally relied upon Amoco to properly calculate rental charges and further relied upon Amoco's representation that the Capital Asset Ledger was correct and accurate.

(Doc. 75, ¶¶ 61–66.) The elements of this claim are essentially the same as those for Count II: (1) a promise which the promisor never intends to keep and makes with intent to deceive and induce the promisee to act upon the promise; (2) reasonable and detrimental reliance on the promise by the promisee; and (3) ultimate failure to perform by the promisor. *Anderson,* 249 Kan. at 469, 819 P.2d 1192.

Amoco contends that it is entitled to summary judgment on Count V because, as with the misrepresentation claim in Count II, plaintiffs cannot establish *reasonable* or *detrimental* reliance. Amoco once again argues that the integration clauses in the Lease Agreements preclude plaintiffs' allegations that they *reasonably* relied on any representations outside those in the contract itself. Amoco also argues, as it did in connection with Count II, that plaintiffs have admitted that they had no choice but to pay the rental amount stated in the contract and, therefore, cannot establish *detrimental* reliance. The court agrees with these arguments. Plaintiffs have essentially admitted that, regardless whether Amoco made misrepresentations or not, they still would have entered into their agreement with Amoco and paid the rent. There is thus no "but for" causal connection between Amoco's alleged misrepresentations and plaintiffs' alleged injuries.

*Remus,* 794 F.2d at 1241–42; *Slaymaker,* 241 Kan. at 532, 739 P.2d 444.

## VI. *COUNT VI: Breach of Duty of Good Faith*

In Count VI of their Amended Complaint, plaintiffs allege that a "special relationship" exists between Amoco and plaintiffs giving rise to a fiducial obligation of good faith on Amoco's part.

Under the various agreements between plaintiffs and Amoco ... there exists a special relationship pursuant to which Amoco has attempted to reserve for itself the discretion to make numerous decisions affecting the relationship, including establishing plaintiffs' price for motor fuel, station rentals, station hours, credit arrangements and agreement renewals, and expects plaintiffs to trust and place confidence in Amoco to exercise its discretion for the mutual benefit and profitability of both Amoco and plaintiffs, and further negotiate in good faith.

In addition, through various means, Amoco purportedly provides plaintiffs professional business advice and technical advice for the operation of their Amoco branded business operations.

... Amoco represented and it was understood and agreed that Amoco would, and plaintiffs placed their trust and confidence in Amoco to, use its discretion to fairly establish competitive prices, rents, credit arrangements, policies and programs in good faith and further to negotiate in good faith, so as to mutually benefit plaintiffs and Amoco and allow the greatest profit to each of them, and allow plaintiffs to successfully compete in the marketplace.

(Doc. 75, ¶¶ 69–70.) According to plaintiffs, Amoco has breached this fiduciary obligation of good faith, as well as its "covenant of good faith and fair dealing ... implied by law in every contract"

by abusing and acting outside the scope of the discretion granted, frustrating plaintiffs' reasonable expectations, and usurping the benefits of the contract so that Amoco would achieve high profits at plaintiffs' detriment and expense, and by failing to negotiate in good faith.

*Id.* at ¶ 72. Plaintiffs enumerate seven specific ways in which Amoco has allegedly failed to act in good faith:

a. Increasing its overall percentage of profit from plaintiffs by greatly increasing plaintiffs' rental charges in excess of fair market rental value;

b. Imposing unreasonable service bay rental charges which duplicate rental charges, and by calculating rental charges knowingly based upon false information;

c. Failing to provide plaintiffs promised discounts of the price of motor fuel;

d. Charging plaintiffs unreasonable prices for motor fuel, and in addition a credit card fee;

e. Imposing rental practices which were purportedly designed to shift Amoco's return of investment from gasoline to rent, however resulting in increasing rents but not reducing the DBP;

f. Failing to set the DBP according to represented formulas or fashions; and

g. Pursuing practices and policies designed to secure for Amoco part of the profit margin which plaintiffs, and other Amoco dealers in general, historically enjoyed.

*Id.*

Amoco contends that it is entitled to summary judgment on Count VI because no "fiduciary" or "special" relationship exists between Amoco and its dealers giving rise to additional obligations of good faith, and because no separate and independent cause of action for breach of the implied duty of good faith and fair dealing exists under Kansas law.

Count VI clearly involves a mixture of claims that Amoco breached its fiduciary duties to plaintiffs and that Amoco breached the implied covenant of good faith and fair dealing. Plaintiffs' counsel has authored a similar type of mixed "breach of fiduciary duty and breach of the duty of good faith and fair dealing" claim in another case. *See Pizza Management v. Pizza Hut,* 737 F.Supp. 1154, 1156, 1182–85 (D.Kan.1990). There are three aspects to this mixed claim to be considered.

First, some states recognize a separate cause of action sounding in tort for breach of the implied obligation of good faith and fair dealing where the contracting parties have a "special relationship." Under California law, for instance, "where a 'special relationship' exists between the parties to the contract, breach of th[e] [implied] covenant [of good faith and fair dealing] will give rise to a cause of action in tort." *Little Oil Co. v. Atlantic Richfield Co.,* 852 F.2d 441, 446 (9th Cir.1988) (noting this doctrine was originally confined to insurance contracts). Kansas, however, does not recognize "a tort for breach of the implied covenant of good faith and fair dealing ... in a commercial contract setting," *Pizza Management,* 737 F.Supp. at 1167 (citing *Ritchie Enterprises v. Honeywell Bull, Inc.,* 730 F.Supp. 1041, 1052 (D.Kan. 1990)), and thus, to the extent plaintiffs are attempting to plead such a cause of action, Count VI is ineffectual.

Second, Count VI can also be construed as yet another attempt to state a claim for breach of the implied covenant of good faith and fair dealing. As stated *supra,* the implied duty of good faith and fair dealing is part of every contract (except those involving employment-at-will), and any violation of that duty is a breach of contract. Hence, in order to prevail on an implied duty of good faith and fair dealing theory under Kansas law, plaintiffs must (1) plead a cause of action for "breach of contract," not a separate cause of action for "breach of duty of good faith," and (2) point to a term in the contract "which the defendant[ ] allegedly violated by failing to abide by the good faith spirit of that term." *Pizza Management,* 737 F.Supp. at 1184. Plaintiffs' allegations in Count VI, enumerating the seven ways in which Amoco has allegedly failed to act in good faith (¶ 72 a–g, quoted *supra* ), focus on the pricing term in the DSAs and the rent amount term in the Lease Agreements. The court has already considered good faith and fair dealing claims in connection with those terms and will not revisit them.

Third, and finally, the main thrust of Count VI appears to be that Amoco had an obligation of good faith because a "special"

fiduciary relationship had developed between Amoco and plaintiffs. Amoco contends that no such fiduciary relationship exists.

 " 'A fiduciary is a person with a duty to act primarily for the benefit of another.' " *Flight Concepts,* 38 F.3d at 1158 (quoting *Denison State Bank v. Madeira,* 230 Kan. 684, 691, 640 P.2d 1235 (1982)). A fiduciary relationship may be "implied in law from the surrounding facts and the relationship of the parties," *Daniels v. Army National Bank,* 249 Kan. 654, 656, 822 P.2d 39 (1991) (citing *Denison,* 230 Kan. at 691, 640 P.2d 1235), but its existence cannot be established "inadvertently," *Flight Concepts,* 38 F.3d at 1158 (citing *Rajala v. Allied Corp.,* 919 F.2d 610, 614 (10th Cir.1990), *cert. denied,* 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991)). Indeed, under Kansas law, a party seeking to establish the existence of a fiduciary relationship must do so by clear and convincing evidence, including proof that the other party "consciously assumed" the responsibilities of a fiduciary:

> ... the Supreme Court of Kansas has prescribed "certain broad principles which should be considered in making the determination of whether a fiduciary relationship exists in any particular factual situation:
>
>> A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.*
>
> *Id.* [*Denison,* 230 Kan. at 691, 640 P.2d 1235] (emphasis in original).

The court in *Denison* made clear that each of the general considerations listed above need not be present in every case in which a fiduciary relationship is alleged. However, the court emphasized that an overriding consideration in the law of fiduciary relationships was that "one may not abandon all caution and responsibility for his own protection and *unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary."* *Denison,* 230 Kan. at 696, 640 P.2d at 1243–44 (emphasis added). The court went on to state that "[t]his is particularly true when one ... is fully competent and able to protect his own interests." *Id.*

A fiduciary relationship whereby both parties assume fiduciary obligations to each other or to a common entity similarly requires a conscious assumption of fiduciary obligations by the parties. For example, in *Paul v. North,* 191 Kan. 163, 380 P.2d 421 (1963), the Supreme Court of Kansas stated that fiduciary relationships

> "may arise out of conduct of the parties evidencing an agreement to engage in a joint enterprise for the mutual benefit of the parties.... But they necessarily spring from an attitude of trust and confidence and *are based upon some form of agreement, either expressed or implied, from which it can be said that the minds have met in a manner to create mutual obligations."*

*Id.* 191 Kan. at 170, 380 P.2d at 426 (citations omitted) (emphasis added). Although a fiduciary relationship may arise out of an agreement to act together for the mutual benefit of the parties, such a relationship cannot be established by accident or inadvertence.

> "Mere concert of action without more, does not establish a fiduciary relationship.... Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they *willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises."*

*Wolf v. Brungardt,* 215 Kan. 272, 285, 524 P.2d 726, 736 (1974) (emphasis added).

This court [the Tenth Circuit] has also recognized that conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law. *See Hotmar v. Lowell H. Listrom & Co., Inc.,* 808 F.2d 1384, 1387 n. 3 (10th Cir.1987); *cf.* 36A

C.J.S. Fiduciary, 385 (1955) ("As a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship") (footnotes omitted).

Although the courts of Kansas have suggested that a somewhat more protective approach may be used when one party is under a disability or disadvantage, *Cornett v. Roth,* 233 Kan. 936, 941, 666 P.2d 1182, 1186 (1983), *Wedman v. Home Nat. Bank of Arkansas City,* No. 88–1439–K (D.Kan., Jan. 25, 1990) (WESTLAW, 1990 WL 7501), this more protective approach will ordinarily not be utilized as between two or more business people or business entities who each possess the capacity to protect themselves. *See Ritchie Enterprises v. Honeywell Bull, Inc.,* 730 F.Supp. 1041, 1054 (D.Kan.1990) (holding that a seller's superior knowledge of a product does not justify imposition of a fiduciary relationship in the absence of a conscious assumption of fiduciary duties). The Supreme Court of Kansas has cautioned against an approach which would unfairly "convert ordinary day-to-day business transactions into fiduciary relationships where none were intended or anticipated." *Denison,* 230 Kan. at 696, 640 P.2d at 1243.

*Rajala,* 919 F.2d at 614–15.

In addition to these principles, whether fiduciary obligations exist in a case like the present one must also be viewed in light of the parties' contractual franchisor-franchisee relationship. Judge Crow tackled this issue in *Pizza Management,* 737 F.Supp. at 1182–85, discussed *supra.* He considered (1) "whether Kansas law would recognize a franchise relationship to implicate fiducial obligations," and (2) "if not, then whether the facts and circumstances between the parties could justify implying a fiduciary relation." *Id.* at 1183.

With respect to issue (1), Judge Crow noted that, according to most courts, "[t]he franchisor-franchisee relationship is typically not fiducial or confidential in nature, and a franchise agreement generally does not give rise to a fiduciary relationship." *Id.* (citing numerous authority). Judge Crow concluded Kansas would follow a similar rule.

The franchisor—franchisee relationship "is an arms-length, commercial one" with the performance of each governed and regulated by the typically exhaustive terms of written franchise agreements. *Rosenberg [v. Pillsbury Co.],* 718 F.Supp. [1146,] at 1155 [ (S.D.N.Y.1989) ]. It is the very nature of franchising that both parties enter into their agreement trusting on the fairness and good faith of the other. Fiduciary obligations should be extended reluctantly to commercial or business transactions. *See Ritchie Enterprises [v. Honeywell Bull, Inc.],* 730 F.Supp. [1041,] at 1052 [ (D.Kan.1990) ]; *LNS Investment Co. Inc. v. Phillips 66 Co.,* No. 87–2215–O, 1989 WL 103637 (D.Kan. Aug. 29, 1989); *Adams Parker Furniture, Inc., v. Ethan Allen, Inc.,* No. 86–2113–S, 1987 WL 56676 (D.Kan. Oct. 13, 1987) (1987 U.S.Dist. Lexis 10244).

Plaintiffs refer to numerous terms of the franchise agreements which they believe show PHI's overwhelming control of the franchisees' operation and performance. Taken individually or together, these instances of discretion or authority under the contract do not make PHI anything more than a common franchisor. *A franchisee's reasonable expectations are sufficiently protected by the standard of good faith and fair dealing governing the franchisor's exercise of contractual responsibilities and powers. Power Motive Corp. [v. Mannesmann Demag Corp.],* 617 F.Supp. [1048,] at 1052 [ (D.C.Colo.1985) ]; *see Bain v. Champlin Petroleum,* 692 F.2d 43, 47–48 (8th Cir.1982). This court has no cause to believe Kansas law would impose fiducial obligations on a franchisor for the sole reason of that status.

*Id.* at 1183 (emphasis added).

Judge Crow then turned to issue (2). Looking to the particular facts and surrounding circumstances, Judge Crow found that because the parties had disavowed any fiducial relationship in the contract and because there was no evidence to show plaintiffs placed any confidence and trust in defendants beyond that inherent in any relation-

ship between a franchisor and franchisee, plaintiffs had not raised a "triable issue of fact" as to whether fiducial obligations even existed, let alone were breached. *Id.* at 1183–84. Judge Crow was particularly reluctant to imply a fiduciary relationship in the commercial setting: "In the setting of a commercial contract between two equally sophisticated business entities, this court is not prepared to impose heightened legal duties on one of the parties simply because that party may have more powers and discretion under the express terms of their agreement." *Id.*

 This court agrees with Judge Crow that fiduciary duties do not arise simply because parties have a franchise relationship in which one party has significantly more discretion than the other. Something above and beyond the ordinary franchise relationship must be shown.

 In this case, many elements characteristic of fiduciary relationships are present, and some of these elements do appear to go beyond those ordinarily associated with franchise relationships. Plaintiffs are in a substantially disadvantageous bargaining position vis-a-vis Amoco and are required to sign standardized, pre-printed form contracts drafted by Amoco—contracts that are arguably not the result of any "arms length" negotiations. Under these contracts, Amoco is both plaintiffs' landlord and plaintiffs' exclusive supplier, and Amoco is given a great deal of discretion in setting not only plaintiffs' gasoline prices, but also plaintiffs' rent. Clearly, as other courts have recognized, there is a certain uniqueness in the gasoline supplier/dealer franchise relationship:

> The relationship of a major oil company to its service station dealer goes beyond the bigness-littleness antithesis that exists in innumerable contract negotiations and in the operations of a modern, large business. The inherent leverage a major oil company has over its dealers results from the market structure of the industry and the special dependence on the company of the service station dealer (who is usually also a lessee).... A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord.

*Shell Oil Co. v. Federal Trade Commission,* 360 F.2d 470, 487 (5th Cir.1966). Indeed, that is why Congress adopted the Petroleum Marketing Practices Act, discussed in footnote 23 *infra.* However, having a unique relationship with characteristics of a fiduciary relationship is, in the commercial setting, not enough. There must also be evidence that Amoco consciously assumed fiduciary-like duties as to the plaintiffs. *See Rajala,* 919 F.2d at 622–25 (finding parties' "unique" joint business arrangement to develop a new high-density film did not give rise to fiduciary duties absent evidence of conscious assumption—the *sine qua non* of the plaintiff's claim); *Flight Concepts,* 38 F.3d at 1158 (finding no evidence that defendants "deliberately assumed the responsibilities of fiduciary in their dealings with [plaintiffs]"). The court perceives no such evidence, and plaintiffs' briefs and exhibits do not set forth any. Indeed, they do not even address the issue.

 The parties' Lease Agreements clearly provide that "the entire control and direction" of the plaintiffs' businesses shall be with plaintiffs, (¶ 21), and plaintiffs do not dispute that they "manage and operate their own businesses, make their own investment decisions, set their own retail prices, and make their own purchasing, advertising, and marketing decisions," (Doc. 127, Amoco's Statement of Relevant Undisputed Facts, ¶ 2.) Like any franchisor and franchisee, the parties have placed confidence in one another and they have certain joint interests (e.g., selling as much gasoline as possible). But the parties have adversarial interests as well (e.g., receiving a larger portion of the profit per gallon sold), and clearly, with respect to those interests, Amoco did not consciously assume any duty to act for plaintiffs' benefit or to put plaintiffs' interests ahead of its own. *See Bank IV Salina, N.A. v. Aetna Cas. & Sur. Co.,* 810 F.Supp. 1196, 1206–07 (D.Kan.1992) (finding insufficient evidence of fiduciary relationship where the parties had adversarial interests and one was given "unfettered discretion" with respect to those interests). This judge, like others of this court, is simply "unwilling to radically alter

the given scheme of commercial dealings by the possible imposition of a fiduciary relationship" absent sufficient evidence of a knowing and willing undertaking of fiduciary-like duties. *Ritchie,* 730 F.Supp. at 1054.[24]

## VII. COUNT VII: Violations of Kansas Consumer Protection Act

Finally, in Count VII of their Amended Complaint, plaintiffs allege that Amoco has violated the Kansas Consumer Protection Act (KCPA). The KCPA prohibits, *inter alia,* any "deceptive act or practice" and "unconscionable act or practice" "in connection with a consumer transaction." K.S.A. §§ 50–626 and 50–627 (Supp.1993). A "consumer transaction" includes "a sale, lease, assignment or other disposition for value of property or services within [Kansas] ... *to a consumer....*" K.S.A. § 50–624(c) (Supp.1993). " 'Property' includes real estate, goods and intangible personal property." K.S.A. § 50–624(g).

Amoco maintains that it is entitled to summary judgment on plaintiffs' KCPA claim because plaintiffs are not "consumers" within the meaning of the KCPA and cannot bring a claim thereunder. K.S.A. § 50–624(b) (Supp. 1993) defines "consumer" as "an **individual** or **sole proprietor** who seeks or acquires property or services for personal, family, household, business or agricultural purposes." (Emphasis added).

In this case, the parties have two disputes revolving around this definition of "consumer." First, the parties dispute whether those plaintiffs who have incorporated their Amoco service station businesses are "individuals" and/or "sole proprietors" within the meaning of K.S.A. § 50–624(b).[25] Second, the parties contest whether the "business purposes" referred to in K.S.A. § 50–624(b) include those purposes for which plaintiffs acquired property from Amoco. In resolving these disputes, the court is guided by the Kansas legislature's instructions that the KCPA is to be "construed liberally to ... simplify, clarify and modernize the law governing consumer transactions [and] protect consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. § 50–623(a) & (b).

### A. Are the plaintiffs who have incorporated their Amoco dealerships "individuals" within the meaning of K.S.A. § 50–624(b)?

K.S.A. § 50–624(b) clearly limits "consumers" to "individuals" and "sole proprietors." Hence, a corporation or similar entity that has suffered an injury as a result of a "deceptive" or "unconscionable" act or practice cannot assert a claim under the KCPA. *See CAT Aircraft Leasing, Inc. v. Cessna Aircraft Co.,* No. CIV.A. 87–1022–C, 1990 WL 171010, 1990 U.S.Dist. LEXIS 14720, at *21–22 (D.Kan. October 3, 1990); *Delhomme Industries, Inc. v. Houston Beechcraft, Inc.,* 669 F.2d 1049, 1060 (5th Cir.1982) (construing the KCPA). An "individual or sole proprietor" must have suffered injury and must make the claim. *Finstad v. Washburn University,* 252 Kan. 465, 845 P.2d 685, 691 (1993).

In the present case, the record confirms that even those plaintiffs who incorporated their service station dealerships arguably suffered injury as *individuals.* Each plaintiff individually signed a DSA and a Lease Agreement with Amoco, and even the most updated of these contracts mentions nothing about any of the plaintiffs doing busi-

---

24. It should be noted that, even if a fiduciary relationship did exist, plaintiffs' breach of fiduciary duty claims would appear to be preempted by the Petroleum Marketing Practices Act or "PMPA", 15 U.S.C. §§ 2801 *et seq.* Congress intended the PMPA to address the disparity in bargaining power between gasoline suppliers and dealers and to protect the dealers from arbitrary and discriminatory practices. *Roberts v. Amoco Oil Co.,* 740 F.2d 602, 605 (8th Cir.1984); *Darling v. Mobil Oil Corp.,* 864 F.2d 981, 984 (2d Cir.1989). This would appear to encompass the sort of fiduciary obligations plaintiffs seek to impose on Amoco in the present case.

25. Among those plaintiffs who have incorporated their Amoco dealerships and dealt with Amoco as corporations are: George Wayman as Wayman's Amoco, Inc.; Brad Rhodes as D & B Enterprises, Inc.; Thomas McClernon as Sweetbriar Standard, Inc.; Donald B. Howell as Indian Hills Standard, Inc.; and Troy Botkin as Rock Road Standard, Inc.

ness as corporations. Lead plaintiff Wayman's agreements, for example, are expressly stated to be between Amoco and "George Wayman," not "George Wayman d/b/a Wayman's Amoco, Inc." (Doc. 128, Exs. 1A & 1B.) Thus, the agreements are not between Amoco and another corporation; they are between Amoco and an individual. If Amoco wanted to enforce these agreements against plaintiffs personally, it no doubt could. Hence, regardless of whether an associated corporate entity exists, the liabilities plaintiffs assumed are individual in nature. Their related KCPA claims are individual as well. That is, the claims are brought in plaintiffs' individual rather than corporate capacities.

Amoco argues that because the corporations, not plaintiffs themselves, made payments to Amoco under the DSAs and Lease Agreements, any alleged injury was borne solely by the plaintiffs' corporations, not by plaintiffs individually. The court disagrees. Plaintiffs' corporate logo may have been on the check that paid for the gasoline, Amoco-branded products, and rent, but plaintiffs were *individually* liable for the cost of those items. In the court's view, the nature of the liability undertaken, not who "picked up the tab," should determine the nature of plaintiffs' KCPA claims. *See Whittenburg v. L.J. Holding Co.,* 830 F.Supp. 557, 566 (D.Kan. 1993) (holding similarly that because Lear business jet was titled in corporate name, the KCPA claim belonged to the corporation, not the individual plaintiffs, even though the Lear jet had been purchased with plaintiffs' personal funds).

B. *Are the purposes for which plaintiffs acquired property from Amoco among those "business purposes" contemplated by K.S.A. § 50–624(b)?*

▇▇ Amoco contends that the term "business purposes" in K.S.A. § 50–624(b) does not include the purchase of goods for resale and that plaintiffs' purchase of products from Amoco does not, therefore, fall within the KCPA. According to Amoco, "[t]he only reasonable interpretation, and the only one con-

sistent with the KCPA's legislative history, ... is that goods are acquired for business purposes when they are used in (or consumed in) the business—not when they are acquired for the sole purpose of resale." (Doc. 127, p. 75.) Plaintiffs, however, point to the language in the Official Comment following K.S.A. § 50–624(b):

> This definition of "consumer" is intentionally broad. It covers not only individuals who seek or acquire goods, services or real estate for personal, family or household purposes, but also sole proprietors such as farmers and business people.[26]

For four reasons, the court agrees with Amoco that the KCPA recognizes an operative distinction between purchasing goods for resale and purchasing goods to be used or consumed in the course of one's business.

First, it is uncontroverted that the purpose for which plaintiffs acquired gasoline from Amoco was to resell that gasoline to customers for profit. Plaintiffs do not themselves "consume" the gasoline that they purchase from Amoco.

Second, the court can find no case authority applying the KCPA to a transaction involving the purchase of goods for resale. The only authority cited by plaintiffs is *Musil v. Hendrich,* 6 Kan.App.2d 196, 627 P.2d 367 (1981), and that case is inapposite. *Musil* involved a farmer's purchase of feeder hogs for resale and the scope of the term "agricultural purposes." "Agricultural purposes" is expressly and broadly defined in the Act and includes any transaction "related to the production, harvest, exhibition, marketing, transportation, processing or manufacture of agricultural products." K.S.A. § 50–624(a). "Business purposes," by contrast, are not defined in the Act. Moreover, the comments to the KCPA state that "[a]gricultural transactions are generally covered by this act." No similar comment exists with respect to "business purposes."

Third, the distinction between consuming goods in the course of conducting business and purchasing goods for the purpose of

---

**26.** The comments to the KCPA were prepared by Barkley Clark, Professor of Law at the University of Kansas School of Law, who also served as

consultant to the committees considering consumer protection legislation.

reselling them has been recognized in other consumer protection-type statutes. The Magnuson–Moss Act, a federal statute concerning consumer warranties, defines a "consumer" as a "buyer (*other than for purposes of resale* ) of any consumer product, . . . ." 15 U.S.C. § 2301(3) (emphasis added).

Finally, the KCPA's legislative history indicates that the term "business purposes" was not intended to expand the KCPA's original scope. When enacted in 1973, the KCPA's definition of "consumer" stated:

> "Consumer" means a person other than an organization who seeks or acquires:
>
> (1) Goods or services used or provided in his business, or
>
> (2) goods, services, money or credit for personal, family, household or agricultural purposes.

1973 Kan.Sess.Laws, ch. 217, § 2. Subsection (1) of this definition, particularly the "used or provided in" language, did not appear to include purchases for resale. In 1976, the Kansas House of Representatives proposed House Bill 2733, which would have struck subsection (1) of the KCPA's definition of "consumer" and eliminated all coverage · for business consumers. H.B. 2733, § 2 (1976). The Attorney General's office "opposed removing the small business person under the Act." Minutes of the Senate Committee on Judiciary, March 4, 1976. As a result, the term "business" was simply added to the list of "purposes" for which a "consumer" seeks or acquires property.

> "Consumer" means an individual who seeks or acquires property or services for personal, family, household, *business* or agricultural purposes.

1976 Kan.Sess.Laws, H.B. 2733, ch. 236, § 2 (emphasis added).[27] This was not intended to "change the scope" of the KCPA, but merely to clarify it. Minutes of the Senate Committee on Judiciary, March 10, 1976. That is, it was not intended to expand the definition of "consumer" beyond its original scope in 1973, a scope which did not include purchases for the purpose of resale.

Hence, to the extent plaintiffs' KCPA claims are based on purchases for resale, they are not predicated on a "consumer transaction" and are not cognizable under the KCPA.

C. *What "non-purchase for resale" actions by Amoco, if any, constitute deceptive and unconscionable practices?*

This leaves plaintiffs' claims of deceptive acts and unconscionable practices which do not involve purchases for resale. The court cannot determine from the amended complaint or from plaintiffs' memorandum the acts and practices which are claimed to be *deceptive* as defined in K.S.A. § 50–626 and which are claimed to be *unconscionable* as defined in K.S.A. § 50–627. The distinction is crucial, especially at summary judgment, because the issue whether a *deceptive* act has been committed is for the jury, *Bailey v. Morgan Drive–Away Inc.*, 647 F.Supp. 648, 656 (D.Kan.1986), whereas whether an act is *unconscionable* is for the court, *Farrell v. General Motors Corp.*, 249 Kan. 231, 238, 815 P.2d 538 (1991).

Accordingly, plaintiffs are directed to file a supplemental memorandum which specifies the acts which do *not* involve purchases for resale but which are claimed to be *deceptive*. References to the uncontroverted issues with appropriate record citations must be made so that the court can determine whether disputed facts exist. In addition, plaintiffs must · similarly specify the acts which they contend are *unconscionable*. The court will then make its ruling regarding the remainder of Count VII.

### ORDERS

IT IS ACCORDINGLY ORDERED that defendant's motion for summary judgment (Doc. 126) is hereby granted in part, denied in part, and taken under further advisement in part. Defendant's motion is granted with respect to Counts II, III, V, and VI of plaintiffs' amended complaint. Counts I, IV and VII remain under advisement only to the

---

27. In 1991, the terms "or sole proprietor" were added resulting in the current definition. 1991

Kan.Sess.Laws, ch. 159, § 1.

extent stated. Argument is *not* invited on Counts IV and VII.

The parties will be permitted to file supplemental memoranda addressed *only* to the reserved issues. Initial memoranda shall be filed simultaneously on February 5 and shall not exceed 15 pages. Responsive memoranda shall be filed simultaneously on February 12, 1996 and shall not exceed 10 pages. No further memoranda or letter briefs shall be submitted. Single-spacing, small type or excessive footnotes must not be used.

No motion for reconsideration of this order shall be filed unless authorized by the court at a status conference which will be scheduled soon after the court rules on the issues remaining under advisement.

IT IS SO ORDERED.

### *SUPPLEMENTAL MEMORANDUM AND ORDER*

In its Memorandum and Order of January 26, 1996 (Doc. 222), the court identified three issues for further briefing. The parties have filed their memoranda (Docs. 223, 224, 226 and 228) and the court is prepared to rule.

### *THE ESTOPPEL ISSUE*

Count I of plaintiffs' amended complaint concerned plaintiffs' contention that Amoco breached both written and oral promises to discount the price of the gasoline Amoco sold to plaintiffs (the Dealer Buying Price or DBP). The court found that the price of gasoline was governed by written agreements between plaintiffs and Amoco known as Dealer Supply Agreements (DSAs). The court rejected plaintiffs' contentions that they should be able to introduce evidence of the existence and breach by Amoco of other promises which, if received, would vary the terms of the DSAs. The effect of the court's rulings was to grant summary judgment in Amoco's favor on Count I, with the exception of an issue raised, *sua sponte*, by the court: whether Amoco should be equitably estopped from contending that the price of gasoline was exclusively controlled by the DSAs be-

cause of representations Amoco made in an earlier case [1] which arguably are inconsistent with Amoco's position that it never promised to give plaintiffs a DBP discount. The court raised U.C.C. § 2–201(3)(b) [2] as one of the doctrines which might create such an estoppel (Doc. 222 at 32–34). The Kansas version of this section is K.S.A. § 84–2–201(3)(b).

### *K.S.A. § 84–2–201(3)(b)*

The statute provides, in pertinent part:

**Formal requirements; statute of frauds.** (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought....

\* \* \* \* \* \*

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

\* \* \* \* \* \*

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted[.]

The statute was discussed in some detail in *Quaney v. Tobyne*, 236 Kan. 201, 689 P.2d 844 (1984). The court observed, in pertinent part:

Under subsection (1) of the statute an oral contract for the sale of goods for the price of $500 or more is not enforceable unless one of the exceptions under subsection (3) is satisfied. It is agreed that the exceptions contained in subsection (3)(a) and (c) are not applicable, and that plaintiffs must rely solely on section (3)(b) in order to avoid the application of the statute. The issue of law presented is whether, on the record before us, the defendant,

---

**1.** *Amoco Oil Co. v. Hughes,* No. 82–1870 (D.Md. 1982).

**2.** The court's reference should have been to § 2–201(3)(b). The parties have recognized the court's error.

as the party against whom enforcement of the oral contract is sought, admitted in his pleadings, testimony, or otherwise in court that an oral contract for sale was made.

\* \* \* \* \* \*

In order to come within the terms of the exceptions stated in 84–2–201(3)(b), a statement must in fact constitute an admission . . .

\* \* \* \* \* \*

The question of what constitutes an admission under U.C.C. § 2–201(3)(b) is discussed in 2 Anderson, Uniform Commercial Code § 2–201:216, pp. 116–17 (3rd ed. 1982), where the author states:

"There is an admission for the purpose of UCC § 2–201(3) when there is a manifestation that fairly communicates the concept that the party has admitted the existence of the contract. It is not necessary that there be an express declaration that the party 'admits' the making of an oral 'contract.' It is sufficient that his words or conduct reasonably lead to that conclusion.

. . . .

"When a party admits facts the legal consequence of which is that there is a contract, it is to be concluded that there has been an admission of the existence of the contract. The fact that the party does not appreciate or understand that the subsidiary facts admitted by him have the effect of creating a contract or that he is unwilling to state that they did does not negate the fact that a 'contract' has been admitted. On this basis, it has been held that there is an 'admission' so as to take an oral contract out of the statute of frauds when the party denying the existence of a contract and pleading the statute of frauds testifies to facts from which it can be concluded that a contract had been formed, even though he does not expressly admit that a contract was formed."

2 Williston on Sales § 14–9, p. 306 (4th ed. 1974), in discussing the admissions exception, states:

"The mere fact that a party has, by pleading, testimony or otherwise in court admitted to the existence of a contract does not mean that it is an admission of every individual term of the contract between the parties. Of course, if the party against whom enforcement is sought admits to the terms of the contracts *seriatum*, it would be extremely difficult to visualize a situation where the trier of the facts would not find that an oral agreement between the parties had not in fact taken place."

In *Decatur Cooperative Association v. Urban*, 219 Kan. 171, 547 P.2d 323 (1976), the court referred to the requirements of K.S.A. 84–2–201 and stated that the statute of frauds was enacted to prevent fraud and injustice, not to foster or encourage it, and a court of equity will not ordinarily permit its use as a shield to protect fraud or to enable one to take advantage of his own wrong. The court then proceeded to hold that a party to an oral contract may be equitably estopped to assert the statute of frauds as a defense. The important point is that the court construed the statute of frauds liberally to achieve a result which was equitable and just under the circumstances of the case rather than take a strict approach to the application of the statute.

We also have the relevant consideration of what constitutes an "admission" that a contract for sale was made. It is a well recognized rule that the terms of an oral contract and the consent of the parties may be proved by their *acts* and the attending circumstances, as well as by the words they have employed. The acts and conduct of a party are frequently as expressive as spoken or written statements, and they may be proved in some instances under the principles applicable to admissions. 29 Am.Jur.2d, Evidence 623, p. 677. For example, in *Allen v. Bowling*, 173 Kan. 485, 249 P.2d 679 (1952), it was held that the existence of an oral agreement and its terms may be ascertained from a combination of written communications and the *acts* of the parties. In this regard, we also note 31A C.J.S., Evidence § 291 and the cases cited, which declare that an admission may be made by *conduct*, such as

conduct which may fairly be interpreted as an admission against interest and conduct inconsistent with the party's contentions in the litigation.

We have considered all of these various authorities and the principles of law established thereby and have concluded that the exception to the statute of frauds contained in K.S.A. 84–2–201(3)(b) is satisfied when the party who has denied the existence of an oral contract in reliance on the statute takes the stand and, without admitting explicitly that a contract was made, testifies as to his statements or his actions which establish the terms of the oral contract claimed by the opposing party. It is not necessary that there be an express declaration in which the party admits the making of the oral contract. It is sufficient if his words or admitted conduct reasonably lead to that conclusion.

236 Kan. at 206–10, 689 P.2d 844 (emphasis in original).

 Relying heavily on *Quaney*, plaintiffs urge that Amoco's words and conduct constitute an admission of the alleged promise. While the court recognizes the rule cited in *Quaney*, its application does not relieve this court of an obligation to scrutinize the components of the proffered words and conduct combination, particularly when the words are in the form of pleadings where credibility and other traditional jury issues are not involved. (Compare *Quaney*, where no document of any kind was involved). In other words, the court's inquiry is similar to its threshold duty to determine whether the language of a contract is ambiguous. If the court finds as a matter of law that the written words are unambiguous and do not constitute an admission, then there is no basis for an estoppel.

### The Amoco v. Hughes Representations

In its January 26 Memorandum and Order, the court focused on representations made by Amoco in pleadings in the *Hughes* case. The portion of the pleadings specifically cited by the court states:

> Amoco's Discount for Cash Program achieves an "unbundling" of the price of gasoline and credit and consequent lower-ing of the price of gasoline to the dealer. Under the program, Amoco charges the Amoco dealer a credit card processing fee of 4% on each credit card transaction, reflecting the cost to Amoco of extending credit and administering the credit card program. Simultaneously, Amoco lowers the dealer buyer price of gasoline by an amount reflecting the revenues derived from the credit card processing fee. In effect, Amoco takes the cost of the credit card system out of the price of its gasoline.

(Doc. 164, Ex. 8, Memorandum in Support of Motion for TRO at 4).

While the court did not cite any other portions of the *Hughes* pleadings, it also considered the excerpt cited by plaintiffs in their supplemental memorandum:

> In other states, in order to achieve a more equitable distribution of the cost of credit, Amoco has instituted a "Discount for Cash" program. Pursuant to this program, Amoco reduces the buying price of gasoline to the dealer by an amount reflecting the cost of credit in the specific geographic area. When credit slips are remitted to Amoco by the dealer, Amoco charges a credit card processing fee for each actual credit card transaction. Amoco additionally encourages its dealers to pass the benefits of the decreased wholesale price of gasoline on to consumers who elect to pay cash for gasoline and other products.

(Doc. 164 at Ex. 8, Compl. for Decl. Relief and Prel. and Per. Injunction, ¶ 12).

Plaintiffs argue that the *Hughes* pleadings support their position that Amoco "promised" to discount the DBP to offset the fee plaintiffs were required to pay Amoco under the DFC program (Doc. 75 at ¶ 19). In their most recent memoranda, plaintiffs have described the promise as follows: "... Amoco in fact promised to provide a DBP offset in exchange for plaintiffs' participation in the DFC program, including plaintiffs' payment of the percentage credit card transaction fee" (Doc. 224 at 4). Amoco responds that nothing in the *Hughes* pleadings amounts to a statement that it "promised" a discount (Doc. 223 at 1). Plaintiffs reply that the *Hughes*

pleadings, "taken together as a whole" with other facts create a jury question about the alleged promise (Doc. 228 at 1–2).

The court finds as a matter of law that the *Hughes* pleadings are unambiguous and do *not* constitute an admission of the promise alleged by plaintiffs.

### Amoco's Pleadings in This Case

Plaintiffs claim that Amoco admitted the "promise" in its answer in *this* case (Doc. 224 at 3). Amoco responds that it has admitted the existence of the DFC program and that it provided a DBP discount "at its election" (Doc. 77 at ¶¶ 19, 22). Amoco denies that it admitted, either in its answer or in any other pleading in this case, that it promised dealers who participated in the DFC program that they would receive a DBP discount. Amoco asserts that it has consistently maintained that the price of gasoline was governed exclusively by the DSAs (Doc. 223 at 2–3 and Doc. 226 at 2–3).

Once again, interpretation of Amoco's pleadings is initially for the court and the court finds neither ambiguity in the pleadings nor an admission of the alleged "promise."

### Statements of Amoco's Witnesses and Documents

Plaintiffs assert that a jury question about the "promise" is created by the testimony of Amoco employees. They cite an affidavit submitted by Amoco employee John Bergman in *Remus v. Amoco*, 794 F.2d 1238 (7th Cir.1986), which states, in pertinent part:

Beginning in 1982, Amoco started a new program, the Discount for Cash Program, in Wisconsin. Among other things, the Discount For Cash Program was designed to eliminate the cash customer's subsidization of the Amoco credit card system and to enable the dealer or jobber to give a price discount to cash purchases of gasoline, a rapidly growing segment of the gasoline market. In addition, the DFC Program was intended to afford gasoline purchasers a choice not previously available: to use the Amoco credit card and enjoy the convenience of purchasing on credit, or to pay cash and benefit from the cash discount offered by dealers and jobbers.

To achieve these goals, the DFC Program separates or "unbundles" the price of gasoline from the costs of the credit card system. Whereas prior to 1982 Amoco recovered the costs associated with its credit card system by including those costs in the prices it charged its dealers and jobbers for gasoline, under the DFC Program Amoco takes the costs of the credit card system out of its gasoline prices. Amoco does this by granting dealers and jobbers a discount off the regular dealer gasoline buying price. System-wide, the total discount equals the costs which previously would have been added to gasoline prices in order to pay for the credit card system.

\* \* \* \* \* \*

At the beginning of the Program, Amoco gave plaintiff and its other Wisconsin service station dealers a 2.8¢ per gallon price discount off the regular dealer gasoline buying price. This price discount applied to all gallons of gasoline purchased by dealers from Amoco, regardless of whether dealers resold the gasoline to retail customers on a cash or credit basis. At the same time, Amoco charged plaintiffs and all other dealers a 4% credit card fee when Amoco purchased their credit card slips. The fee applied only to their credit card sales. The price discount and fee were designed on a system-wide basis to be equivalent and offset each other. At the end of October 1982, the credit card fee was reduced to 3% and the price discount to 2.1¢ per gallon. Those terms have remained the same ever since.

Amoco's response simply is that any "promise" based on an affidavit submitted in *Remus* has already been resolved in Amoco's favor by the Seventh Circuit's ruling that Remus' "... claim that Amoco used misrepresentation to get him to go along with the discount for cash program will be important only if we accepted Amoco's argument that Remus had a choice; we don't, so it isn't." 794 F.2d at 1241–42. While this response is somewhat off-target, the court nevertheless

finds nothing in the affidavit which amounts to an admission of the alleged "promise."

Plaintiffs also submit portions of the trial testimony of Amoco employee Roger Sherwood, given in *Ervin v. Amoco Oil Co.*,[3] a case discussed in detail in the court's January 26 Memorandum and Order (Doc. 222 at 52–64):

> Q. There has been testimony here that when the discount-for-cash program first went into effect back in the early '80s, that dealers were told that they would have a discount off their buying price, that is, the price they paid Amoco for gasoline. Do you recall that?
>
> A. Yes, sir.
>
> Q. What was the reason for giving dealers the discount off the price they pay Amoco for gasoline?
>
> A. So that they could have a competitive cash price with the largest part of our business, the cash market.
>
> Q. Was it a factor that they also were going to be paying a credit card fee?
>
> A. Yes, it was.
>
> Q. There has been some question raised in this courtroom about whether the discount was still being given to dealers. First, how much was the discount off the buying price that was being given to dealers if they participated in the discount-for-cash program?
>
> A. It's 2.1 cents.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Q. Are dealers still receiving the 2.1 cent discount? Let me phrase it a different way. Is Amoco still deducting 2.1 cents per gallon for the discount-for-cash program when it charges dealers for the gasoline and sells them?
>
> A. Yes, they are.

Finally, plaintiffs make reference to an Amoco document which instructed its territory managers to inform dealers that:

> Today's research supports the original 1982 conclusions. 1989 research indicates that if Amoco would drop the whole D–F–

C program we would lose market share. You must remember that eliminating the program would not only mean dropping the credit transaction fee and returning to cash and credit same price; it would also eliminate the D–F–C wholesale discount. This would affect your ability to price competitively on the street.

(Doc. 224 at 3).

The court concludes as a matter of law that the Bergman affidavit, the Sherwood testimony and the Amoco document, considered individually or together, do not constitute an admission by Amoco of the existence of the alleged DFC/DBP offset "promise."

Accordingly, the court finds no basis for an estoppel under K.S.A. § 84–2–201(3)(b).

### *Quasi–Estoppel*

■ In the alternative, plaintiffs urge that the doctrine of quasi-estoppel should be applied and that all the evidence regarding the alleged DFC/DBP offset should be received. Quasi-estoppel applies where a party has taken a position which is so inconsistent with the position now taken as to render the present claim unconscionable. *Wichita Fed. Savings & Loan Ass'n v. Black*, 245 Kan. 523, 536, 781 P.2d 707 (1989).

For the reasons stated in connection with the application of K.S.A. § 84–2–201(3)(b), the court finds that Amoco has not taken an inconsistent position with regard to the nonexistence of the DFC/DBP offset "promise." The doctrine of "quasi-estoppel" is inapplicable.

### *THE IVR ISSUE*

Count IV of plaintiffs' amended complaint concerned some of plaintiffs' contention that Amoco breached their leases by improperly and unreasonably calculating rents under the Investment Value Rent (IVR) program (Doc. 75). In its January 26 Memorandum and Order, the court required plaintiffs to "*specifically* identify Amoco's failure to follow its policy with appropriate citations to the rec-

---

**3.** 885 P.2d 246, 250–51 (Colo.App.1994), *aff'd in part, rev'd in part and remanded,* 908 P.2d 493 (Colo.1995).

ord" so that it could identify disputed issues of material fact, if any (Doc. 222 at 64–66).

Plaintiffs first identify the expert report of Steve Martens, who states: "... it would appear that Amoco did not follow its own strategy in implementing bay rentals ..." (Doc. 164, Ex. 14). Amoco responds that Martens' observation is not sufficient to create an issue of fact, citing *Reazin v. Blue Cross Blue Shield of Kansas, Inc.,* 663 F.Supp. 1360, 1479 (D.Kan.1987), *aff'd in part, rev'd in part on other grounds,* 899 F.2d 951 (10th Cir.), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990). The court finds for Amoco, but for a different reason.

Fed.R.Civ.P. 56(e) requires that facts opposing summary judgment must be admissible in evidence. Martens' report, either in whole or in part, is *not* admissible. For plaintiffs to rely on Martens' opinions, they could have, and should have, set them out in an affidavit or cited to portions of Martens' deposition, which is over 350 pages long. The court is not obligated to dig through the deposition to determine what, if any, testimony pertains to Martens' report and whether it creates a factual dispute which requires a trial.[4]

Plaintiffs next contend that rent calculated according to Amoco's IVR program included assets which purportedly existed at a dealer's station. The assets were listed on a capital asset ledger. Plaintiffs contend that it was Amoco's policy to remove assets from the ledger when they were removed or replaced at the station, thereby eliminating them from use in calculating the dealer's rent. These claims appear to be supported by admissible facts (Dep. of Pete M. Christy, Doc. 165 at AOGEN 870–71). Plaintiffs *then* contend that "... items which were never at the stations, or which were removed from the stations, were placed or left on the capital asset ledger and were included in Amoco's calculations of dealer's rent," citing the affidavit of lead plaintiff Wayman (Doc. 224 at 9). Wayman's affidavit basically states that he was shown the capital asset ledger "... to

determine if any items of property were no longer in use and should be deleted ..." but because of inadequate information, he was unable to make the determination.

Amoco responds that despite all the discovery, plaintiffs have never identified a particular error in the ledgers and that as far as plaintiff Wayman is concerned, errors in his ledgers were corrected (Doc. 226 at 6 citing Doc. 179, Ex. M, a Dec. 16, 1991 letter from Roger Sherwood to Wayman).

Once again, the court agrees with Amoco. The rules require a party opposing summary judgment to set forth *specific* facts (Doc. 222 at 5). This is what the court required in its January 26 Memorandum and Order. Affidavits which state the dealers' unspecific belief that the ledgers are inaccurate are not sufficient. The parties have represented that discovery is complete for purposes of the motion. The capital asset ledgers have been produced. It is inconceivable that review of the capital asset ledgers by the dealers and the lawyers would not have disclosed inaccuracies, if they existed, and it was incumbent on plaintiffs to make such inaccuracies known to the court if they wished to avoid summary judgment on this issue.

Plaintiffs' final contention is that Amoco's IVR policy was that "... items making up a dealer's service bay are not to be used ..." to calculate rent but that Amoco nonetheless double-counted such items in the capital asset ledger which then was used to calculate a dealer's rent (Doc. 224 at 9). Lead plaintiff Wayman explains his understanding of the double-counting as follows:

[T]he separate service bay charge was assessed for use of the same space, building and capital assets already included in the real estate appraisals and capital asset ledgers against which the 8% factor was applied. Thus, the service bay charges are in addition to the rental charges for the use of the stations' premises.... When I signed the Lease Agreement that was executed after IVR was implemented, I understood that Amoco would, at all times,

---

4. Out of an abundance of caution, the court has reviewed plaintiffs' memorandum in opposition to summary judgment to determine whether por-

tions of Martens' deposition are cited (Doc. 163). None are.

implement the IVR program to do the things which it represented and in turn provide a rent charge to me which was reasonable and in keeping with the IVR program.... When I signed the lease ... I expected that the rent was for use of the space and did not include a separate assessment or bay charge.

(Doc. 179, Wayman affidavit, ¶¶ 45, 46).

Amoco responds that plaintiffs simply do not understand the IVR program, which expressly stated that station rentals are calculated by:

The appraised value of a station's land, plus the original dollar cost of improvements, times 8 percent gives us the base figure: the capital charge portion of the rent.

To this is added an annualized maintenance charge which is the average of the previous three years' actual maintenance. To this is added real estate and personal property taxes.

And, for conventional facilities, there is a $4,500 uniform charge for each automotive service bay per year.

(Doc. 165, Christy affidavit, AOGEN 0876).

Amoco is correct. Although it would appear that plaintiffs may not have "understood" it to be so, the capital charge calculation and the service bay "rent" were part of the IVR program. Thus, plaintiffs have not raised a factual issue about Amoco's failure to follow its policy (Doc. 222 at 65).

### KCPA ISSUES

Count VII of the amended complaint alleged various violations by Amoco of the Kansas Consumer Protection Act, K.S.A. § 50–623, *et seq.* In its January 26 Memorandum and Order the court stated:

What *"non-purchase for resale" actions by Amoco, if any, constitute deceptive and unconscionable practices?*

This leaves plaintiffs' claims of deceptive acts and unconscionable practices which do not involve purchases for resale. The court cannot determine from the amended complaint or from plaintiffs' memorandum the acts and practices which are claimed to be *deceptive* as defined in K.S.A. § 50–626

and which are claimed to be *unconscionable* as defined in K.S.A. § 50–627. The distinction is crucial, especially at summary judgment, because the issue whether a *deceptive* act has been committed is for the jury, *Bailey v. Morgan Drive–Away Inc.*, 647 F.Supp. 648, 656 (D.Kan.1986), whereas whether an act is *unconscionable* is for the court, *Farrell v. General Motors Corp.*, 249 Kan. 231, 238, 815 P.2d 538 (1991).

Accordingly, plaintiffs are directed to file a supplemental memorandum which specifies the acts which do *not* involve purchases for resale but which are claimed to be *deceptive.* References to the uncontroverted issues with appropriate record citations must be made so that the court can determine whether disputed facts exist. In addition, plaintiffs must similarly specify the acts which they contend are *unconscionable.*

(Doc. 222 at 84).

▇▇▇ Plaintiffs have responded by reprising their claims about Amoco's alleged admissions about the DFC/DBP offset promise as well as Amoco's alleged misrepresentations regarding the economic benefits of its various programs and the way rents were calculated under the IVR program. Plaintiffs' responses are inadequate.

First, the court finds as a matter of law that Amoco did not commit any "unconscionable" acts as defined by K.S.A. § 50–627. None of the factors set out in the statute apply to the business relationship between plaintiffs and Amoco. Although Amoco is a large corporation, plaintiffs are experienced businessmen with long-term ties to and dealings with Amoco. Some of plaintiffs dealt with Amoco through or with the assistance of counsel. Plaintiffs are presumptively familiar with the general aspects of being in the retail gasoline and service station business. The court's findings and conclusions with respect to plaintiffs' misrepresentation claims essentially foreclose a jury trial on "unconscionable" acts because plaintiffs rely on the same facts.

Second, given the nature of the parties' business relationship and the court's rulings

regarding the contracts which govern that relationship, it is difficult to see how "deceptive" acts specified in K.S.A. 50–626 have logical application to this case. For example, plaintiffs contend that Amoco's representation regarding the IVR program violates § 626(b)(1)(A) which proscribes "deceptive" representations that property or services have characteristics or benefits that they do not have. Assuming without deciding that the IVR program is a "consumer transaction" (Doc. 222 at 14–16), the Kansas comments state that § (b)(1)(A) forbids conduct misrepresenting the durability or components of a product or the efficacy of a service. This seems more applicable to representations a carpet cleaner might make to a customer than a national petroleum marketer dealing by written agreements with service station operators who are its franchisees and lessees. Similarly, while plaintiffs assert that Amoco's alleged promises about the DBP discount and the IVR program constitute violations of § (b)(7) and (10), the comments do not appear to contemplate the facts involved here. Section (b)(7) speaks to former price comparisons, competition price comparisons and comparable value comparisons such as might occur between competing businesses which sell furniture. Section (b)(10) forbids representations about "going out of business" when such is not the case. Liberal interpretation of the KCPA simply does not stretch far enough to make these provisions applicable to the facts of this case.

Third, the court is not persuaded by plaintiffs' argument that the DFC and credit card programs do not involve goods for resale. Both programs relate directly to plaintiffs' purchase of gasoline from Amoco for resale to consumers (Doc. 222 at 81–84).

Fourth, while it is arguable that the IVR program did not involve goods for resale, the court has already found that the "misrepresentations" alleged by plaintiffs are factually unfounded and based upon misinterpretations or misunderstandings about the program (*supra* at 1370–1372). Plaintiffs simply have failed to present factual disputes about the IVR program which require a jury trial on their KCPA claims.

## ORDERS

Amoco's motion for summary judgment is sustained as to all counts of plaintiffs' amended complaint.

The status conference mentioned in the court's January 26 Memorandum and Order will be held on March 1, 1996 at 9:00 a.m. Out of town counsel may appear by telephone. Plaintiffs' counsel must be prepared to discuss the issues upon which reconsideration will be requested, keeping uppermost in mind this court's Rule 7.3 and the standards set forth in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (D.Kan.1992), as well as the mandate of Fed.R.Civ.P. 1. Counsel are encouraged to confer in advance of the status conference about the practicality of reconsideration vis-a-vis appeal, given the length of time this case has been on file and the additional time which will be required to brief and decide reconsideration issues.

IT IS SO ORDERED.